Wanda B. STACY, et al.,
Appellants/Respondents,

v.

TRUMAN MEDICAL CENTER, et
al., Respondents/Appellants.

No. 74346.

Supreme Court of Missouri,
En Banc.

July 21, 1992.

Motion for Clarification Overruled
Sept. 22, 1992.

Opinion Modified on Court's own
Motion Sept. 22, 1992.*

* Price and Limbaugh, JJ. not participating.

Scott Mach, Max Von Erdmannsdorff, Mark C. Kuhls, Michael D. Gibbons, Kansas City, for appellants.

Timothy S. Fretts, R. Douglas Gentile, Mitchell L. Herren, Kansas City, for respondents.

Steven L. Hobson, Kansas City, amicus.

THOMAS, Judge.

This consolidated appeal involves two wrongful death actions that were filed as a result of a fire that occurred in room 327 at Truman Medical Center (TMC) on December 30, 1986. Stephen Stacy and Dale Wheeler were patients in the room and died as a result of the fire. Wanda Stacy, Stephen's mother, and Stephen's three children, Michael, Stephanie and Lindsey, filed a wrongful death suit against TMC and one of its nurses, Michelle Taylor. Thelma Allen, Dale's mother, and Amanda Wheeler, Dale's daughter, brought a similar suit, and the cases were consolidated for discovery and trial. The plaintiffs in both actions below will be referred to collectively as "plaintiffs."

Both the Stacy and Wheeler cases were tried before a jury on negligence theories. The jury returned verdicts in favor of both plaintiffs against defendant TMC but in favor of defendant Michelle Taylor on both claims. The amount of the verdicts accepted by the trial court after all post-trial motions had been ruled were $500,000.00 for the Wheeler plaintiffs and $188,000.00 for the Stacy plaintiffs. The issue of sovereign immunity was not submitted to the jury; the trial court ruled as a matter of law in connection with its rulings on post-trial motions that defendant TMC was a public entity entitled to sovereign immunity. The Missouri Court of Appeals, Western District, reversed on the sovereign immunity issue, finding that TMC was not a public entity. We granted TMC's application for transfer.

## I. THE FIRE

The wrongful death actions resulted from a fire in decedents' room at TMC. On the day of the fire, Cheryl Stacy visited her brother, Stephen Stacy. When Cheryl arrived, Stephen, who suffered from head injuries and was not supposed to walk around, was in a chair smoking a cigarette with the permission of one of the nurses. No one told Cheryl not to let Stephen smoke. Because Cheryl did not see an ashtray in the room, she used a juice cup and a plastic soup tray for her ashes. No member of the hospital staff offered to bring them an approved ashtray.

At approximately 5:00 p.m., a nurse came in and restrained Stephen in his chair with ties to prevent him from sliding out of the chair. Before Cheryl left, she lit a cigarette, held it to Stephen's mouth and extinguished it in the soup tray. When Cheryl left, she believed there were one or two cigarette butts in the soup container. Cheryl testified that she did not think she dumped the soup tray into the wastebasket

but that she could have. She believed the soup tray was on top of the bedside table when she left.

Shortly after 5:00 p.m., a fire started in a wastebasket in room 327 of TMC. There was no smoke detector in the room. Patient Wheeler was in the bed next to the windows. When Stephanie Schreiner, the nurse in charge, discovered the fire, she did not think Wheeler was in immediate danger. First, she unsuccessfully tried to untie Stacy from his restraints. Then, she attempted to put out the fire by smothering it with a sheet. When her attempts to extinguish the fire failed, she ran to the door of the room and yelled for help, which alerted Nurses Cominos and Rodriguez.

After calling for help, Schreiner resumed her attempts to smother the flames with bed linens. Subsequently, she and others grabbed Stacy by the legs and pulled him and his chair toward the hallway. In the process, Stacy's restraints burned through, and he slid from the chair to the floor. Schreiner and her assistants pulled him the remaining few feet out of the room and into the hallway. Schreiner tried to get back into the room but was prevented by the intense smoke, flames and heat.

After initially entering room 327, both Rodriguez and Cominos returned to the nurse's station to sound alarms and to call security. Neither attempted to remove Wheeler from the room. Both ran directly past a fire extinguisher, but neither grabbed it before returning to the room. After Stacy was removed from the room, Cominos entered the room with a fire extinguisher and tried to rescue Wheeler. Because of the intense smoke and heat, however, she was unable to reach Wheeler.

Wheeler died in the room from smoke inhalation. Stacy survived for several weeks, then died as a result of complications from infections secondary to burns.

TMC's policy on December 30, 1986, in case of fire, provided for the removal of patients from the room and out of immediate danger first. In its fire training programs, TMC used the acronym of "RACE" to supply a chronology of steps to take in case of a fire. The "R" meant to rescue or remove the patient first. "A" meant that an alarm should be sounded second. "C" meant that the fire should be contained third, and "E" meant that the fourth order of priority was to extinguish the fire. TMC also had a training movie depicting a trash can fire started by smoking that showed how to pull a patient out of bed by the sheets and drag the patient across the floor at the first recognition of a fire.

TMC's written smoking policy at the time of the fire stated: "No smoking shall be permitted in the Truman Medical Center Health Care Facility except those areas specifically designated and posted as smoking areas...." Room 327 was not posted as a designated smoking area on the date of the fire. The smoking policy further stated: "In the event violations of this policy are observed, the person violating the policy must be requested to discontinue such violation. This shall be the responsibility of all employees and particularly supervisory and security employees." Nurse Cominos admitted violating this portion of the smoking policy on the date of the fire by observing smoking and the use of a juice cup for an ashtray in room 327. She also admitted that she was a supervisory employee on the date of the fire.

## II. STRUCTURE OF TRUMAN

In considering the trial court's ruling that TMC is a public entity under the sovereign immunity statute, this Court must decide whether TMC is simply a not-for-profit corporation (of which there are thousands in Missouri and which, as such, do not necessarily qualify for sovereign immunity) or whether it is enough like a governmental entity that it is entitled to the benefits of sovereign immunity. In fact, TMC is a hybrid entity and is not clearly one or the other. This requires us to examine tediously the organization and operation of TMC and compare it with other hybrid institutions that have qualified for sovereign immunity.

Prior to 1962, Kansas City (the City) owned and operated a hospital called Kansas City General Hospital. In 1962, Kansas City General Hospital and Medical Cen-

ter (KCGHMC), the predecessor of TMC, was formed as a not-for-profit corporation pursuant to Chapter 355, RSMo Supp. 1953. KCGHMC's Articles of Incorporation specifically stated that KCGHMC was formed for charitable and scientific purposes, including providing hospital, medical and dental services to the indigent, and any related educational programs. The incorporation was an attempt by the City to access additional federal funds and private grants not available to the hospital as a department of the City, to alleviate political interference and to reduce administrative problems in the daily operation of the hospital. *Truman Medical Center, Inc. v. N.L.R.B.*, 641 F.2d 570 (8th Cir.1981).

In May of 1970, KCGHMC entered into a Cooperation Agreement, authorized by section 70.220, RSMo 1959, with the City, the Board of Trustees of the Jackson County Public Hospital, and Jackson County (the County) to construct and operate a new hospital. The agreement recognized a need for a facility in the County dedicated to the care of the indigent citizens of the County and City. The parties to the agreement proposed that the City purchase land for the new hospital and convey the land to the County. The County agreed to issue bonds to raise $13,000,000.00 to build and equip the new hospital. Upon completion, KCGHMC was to operate the new hospital, and the City was to provide funds for the provision of services to the indigent citizens of both the County and the City. The City and County were to set guidelines for the admission of patients.

A year later, in November of 1971, the parties entered into another Cooperation Agreement, which also included the Curators of the University of Missouri. This agreement provided for a new facility for the University of Missouri, Kansas City School of Medicine. As in the first agreement, the parties agreed that the County would hold title to all of the land and would design and construct the new hospital. The agreement contemplated that both facilities would be used by KCGHMC and the School of Medicine.

Both facilities were completed in 1976. In November of 1976, KCGHMC, which continued as a not-for-profit corporation, changed its name to Truman Medical Center, Inc. The medical center and medical school complex became known as Truman Medical Center–West.

The Cooperation Agreements require TMC to provide services for the indigent of the City and County, up to the amount of money made available from the City and County for that purpose. TMC receives funds from the State, private organizations and foundations, the County, the City, and its patients. TMC also has its own self-insurance trust and collects medical care charges from insurance providers and self-paid patients as long as TMC can meet its contractual obligations to the City and County to serve the indigent.

TMC is operated by a self-governing Board of Directors consisting of fifty directors. The board nominates and elects twenty-six of its members, a majority, from the public at large. Two directors are selected by Children's Mercy Hospital. In addition, the Executive Director of TMC is a member of the board. The remaining twenty-one directors are associated with or appointed by governmental entities. Seven of the remaining twenty-one directors are selected by the City; seven by the County; six, including the Dean of the Medical School, by the University of Missouri; and one by the Administrative Health Association. TMC's Board of Directors operates the hospital and decides the training and qualifications of the staff.

### III. WHAT IS A "PUBLIC ENTITY" FOR PURPOSES OF SOVEREIGN IMMUNITY?

#### A. STATUTORY CONSTRUCTION

Plaintiffs argue that the trial court erred in granting TMC's Motion for JNOV and in holding that TMC is a "public entity" under section 537.600 and, therefore, entitled to sovereign immunity from tort liability. Prior to 1962, when the City owned and operated the hospital known as Kansas City General Hospital, this Court held that the hospital had sovereign immunity from

tort liability. *See Zummo v. Kansas City*, 285 Mo. 222, 225 S.W. 934 (Mo.1920). *Zummo* involved the hospital that was the predecessor of both KCGHMC and TMC. The issue in *Zummo* was straightforward because the city operated the hospital; by the same token, *Zummo* offers little or no precedent on the issue of whether TMC, the not-for-profit corporation that was created by the incorporation and restructuring described above, is the type of entity that the legislature protects with sovereign immunity.

This Court abolished sovereign immunity in *Jones v. State Highway Comm'n*, 557 S.W.2d 225 (Mo. banc 1977). The legislature, however, restored sovereign immunity by enacting sections 537.600 through 537.650, RSMo 1986 and Supp. 1991. Section 537.600 specifically restored sovereign immunity as it existed prior to *Jones* (prior to September 12, 1977). That statute provides, in pertinent part, as follows:

> Such sovereign or governmental tort immunity as existed at common law in this state prior to September 12, 1977, except to the extent waived, abrogated or modified by statutes in effect prior to that date, shall remain in full force and effect; except that, the immunity of the *public entity* from liability and suit for compensatory damages for negligent acts or omissions is hereby expressly waived in the following instances: ....

§ 537.600.1, RSMo Supp. 1991 (emphasis added) (exceptions omitted).

Section 537.600 introduced the phrase "public entity" without defining it. Section 537.600.3 contains a partial definition related to a multi-state compact agency not relevant to the present discussion. The fact that the legislature partially defined the term "public entity" in 1989, however, signifies that this term is intended to encompass the entities that will be protected under the statute. In turn, based upon the legislative history, this statute protects "public entities" that were protected under the sovereign immunity cases prior to September 12, 1977.

Section 537.700.2(3), RSMo 1986, specifically defines "public entity" for purposes of sections 537.700 to 537.755, RSMo 1986 and Supp.1991, related to risk management for public entities. Section 537.745.1, RSMo 1986, provides that the liability of public entities under sections 537.700 to 537.755 shall be the same as the liability of public entities under the sovereign immunity statute. Thus, the definition of "public entity" in section 537.700.2(3) may be helpful in deciding the scope of "public entities" under section 537.600. Section 537.-700.2(3) provides as follows:

> [T]he following words and terms ... mean:
>
> \* \* \* \* \* \*
>
> (3) "**Public entity**", any city, county, township, village, town, municipal corporation, school district, special purpose or taxing district, or any other local public body created by the general assembly.

Because TMC is not any of the specific entities listed in section 537.700.2(3), but is a private, not-for-profit corporation pursuant to chapter 355, RSMo 1986, TMC is not a defined "public entity" for purposes of sovereign immunity. However, because the case law has treated some hybrid entities, which are not expressly included in the above definition, the issue remains whether as a hybrid entity it is enough like a public entity that it is entitled to sovereign immunity under section 537.600.

### B. CASE LAW

Although not presented in the context of sovereign immunity, the federal court has had occasion to decide whether TMC was a political subdivision of the state for purposes of determining if the National Labor Relations Board had jurisdiction over TMC. In *Truman Medical Center, Inc. v. N.L.R.B.*, 641 F.2d 570, the court held that TMC was not a political subdivision. The court noted that an entity is considered a political subdivision of the state only if it is either created directly by the state, so as to constitute a department or administrative arm of the government, or is administered by individuals who are responsible to public officials or to the general public. *Id.* at 572. In holding that TMC satisfied neither of these tests, the court focused on the fact

that TMC was organized as a not-for-profit corporation, which did not require a special act of the state legislature, and that its relationship to any sovereign was merely contractual. Further, the court stated that the persons who manage TMC are not responsible to public officials or the general public. *Id.* 572–73. The points stressed by the Eighth Circuit in deciding the NLRB/political subdivision issue have also been considered important by this Court in sovereign immunity/public entity cases.

In three recent cases, this Court determined that the entities involved, which were named as defendants in wrongful death actions, were "public entities" entitled to sovereign immunity under section 537.600, RSMo Supp.1991. *State ex rel. Regional Justice Information Service Commission (REJIS) v. Saitz,* 798 S.W.2d 705 (Mo. banc 1990); *State ex rel. Trimble v. Ryan,* 745 S.W.2d 672 (Mo. banc 1988); and *State ex rel. Cass Medical Center v. Mason,* 796 S.W.2d 621 (Mo. banc 1990). We will begin our analysis by summarizing each of these cases and then discuss three features the entities have in common while deciding if these features are present in this case.

First, in *REJIS,* the City of St. Louis and St. Louis County entered an agreement, pursuant to enabling ordinances enacted by both political subdivisions and in accordance with section 70.220, RSMo 1986, to create a regional database of criminal arrests and dispositions. The database was designed to promote efficient law enforcement and the administration of criminal justice. *REJIS,* 798 S.W.2d at 706. The agreement between the City and County provided for the creation of REJIS, a joint commission, to manage the database. The joint commission replaced "REJIS, Inc.," a Chapter 355 not-for-profit corporation that was dissolved. REJIS, Inc., had operated a similar database. Section 70.260, RSMo 1986, allows for the establishment and selection of such a joint commission or board to supervise and manage services contemplated in the agreement. The regional criminal justice system coordinated and administered by the joint commission resembles databases operated by individual law

enforcement bodies. *REJIS,* 798 S.W.2d at 706.

Second, *Trimble,* involved Bi–State Development Agency, which was created in 1949 by a compact between the states of Missouri and Illinois. 745 S.W.2d at 674. The compact was specifically provided for by the legislature in section 70.370, RSMo 1986. Bi–State was created to plan, construct, own, operate and maintain bridges, airports and terminals and to coordinate streets, highways, parking areas, water supply, and sewage and disposal works, recreational and conservation facilities and projects. *Id. Trimble* involved a wrongful death action in which the plaintiff alleged that one of Bi–State's bus drivers was negligent. The interstate compact provides that Bi–State shall consist of ten commissioners, five from each state. The commissioners from Missouri are selected by the governor with the advice and consent of the senate. § 70.380, RSMo 1986, and 745 S.W.2d at 674. The presence of at least three commissioners from each state is required for a quorum, and any action taken by Bi–State requires the majority vote of the commissioners present from each state. § 70.360, RSMo 1986. Further, the compact requires the commissioners to report the agency's operations and transactions to the governor of each state. § 70.370, RSMo 1986.

Finally, Cass Medical Center was organized under sections 205.160 through 205.-379, RSMo 1986, which specifically authorize county commissions to operate county hospitals. *Cass Medical Center,* 796 S.W.2d 621. The elected trustees of such a hospital must report all proceedings during the year to and file a sworn statement of all receipts and expenditures during the preceding year with the county commission, an elected body. The application of sovereign immunity to a county hospital organized pursuant to section 205.160 is well settled. *Gavan v. Madison Memorial Hospital,* 700 S.W.2d 124, 127 (Mo.App. 1985), and *Gabbett v. Pike County Memorial Hospital,* 675 S.W.2d 950, 951 (Mo. App.1984). Similarly, this Court in *State ex rel. New Liberty Hospital District v.*

*Pratt,* 687 S.W.2d 184 (Mo. banc 1985), held that a hospital district created pursuant to chapter 206, RSMo 1986, was entitled to sovereign immunity.

■ After analyzing each of the above-referenced cases, three features common among the entities and relied upon in *Truman Medical Center, Inc. v. NLRB,* 641 F.2d 570, appear to be requirements for sovereign immunity. First, each entity must perform a service traditionally performed by the government, i.e., the provision of a criminal justice database as in *REJIS,* metropolitan transportation as in *Trimble,* and medical care as in *Cass Medical Center.* Obviously, TMC's provision of medical care to indigent residents meets this requirement.

We have avoided characterizing this requirement as calling for a governmental function; such terminology would confuse this requirement with the distinction between the two types of functions performed by municipalities and school districts, i.e., governmental versus proprietary. In fact, this requirement is much broader because we are asking whether this entity does what government has typically done in the past; because government performs both governmental and proprietary functions, activities fitting within either of those categories should satisfy this requirement. In view of the broad range of activities in which the government is involved, it is difficult to envision a hybrid entity that meets the other requirements but would not meet this one.

■ The second, and probably the most critical, requirement of entities entitled to sovereign immunity is that they are controlled by and directly answerable to one or more public officials, public entities, or the public itself. In *REJIS,* the joint commission was responsible to the City of St. Louis and St. Louis County, and in *Trimble,* the Bi–State commissioners from Missouri who are selected by the governor with the advice and consent of the senate must approve all actions of the agency and must report the agency's operations and transactions to the governor. Finally, the elected trustees in *Cass Medical Center*

are controlled by the public itself and must report to the county commission, which is composed of elected officials.

■ In contrast, the City and County do not control TMC; the City and County gave up control of the hospital to a private board of directors when the not-for-profit corporation was organized in 1962. TMC's board of directors consists of fifty directors. Twenty-six of the directors are nominated and elected by the Board itself from the public at large; two are selected by Children's Mercy Hospital; and one is the executive director of TMC. The remaining twenty-one directors are associated with or appointed by public entities or political subdivisions. Therefore, the majority of the board members are neither appointed by nor subject to removal by public officials or the general public and have no connection to Kansas City, Jackson County or the University of Missouri. The entire board determines policy by majority vote and the votes of the government-related directors are not weighted to give them control. No governmental body approves the decisions of the board. Such reporting as exists is after the fact; control remains in the independent board. We hold this is not the kind of accountability to public officials or to the general public required to support an application of sovereign immunity.

■ The third requirement concerns what limitations, if any, apply to the creation of a public entity that will have the benefits of sovereign immunity. Put another way, the basic issue involves how and by whom is government or a public entity formed? New governmental entities or political subdivisions of existing governmental entities are formed by government itself or by the voters acting as a group. We would not expect a group of individuals to be able to form their own governmental body.

Section 70.220 authorizes municipalities and political subdivisions of Missouri to enter into "joint ventures" with other entities or persons to accomplish certain governmental objectives. Although this gener-

al purpose is common to all section 70.220 transactions, the section actually authorizes two very different types of transactions. In the first instance, it authorizes a municipality or a political subdivision of the state to enter into a joint venture with another municipality or political subdivision for the planning, development, construction, acquisition or operation of any public improvement or facility.[1] As discussed above, this was the type of transaction through which REJIS was formed by the City of St. Louis and St. Louis County to collect information concerning arrests and their dispositions. Because either St. Louis County or the City of St. Louis could have engaged in this activity on their own and would have had the benefit of sovereign immunity, the creation of the joint commission did not create a public entity with sovereign immunity where one would not have existed otherwise.

■ On the other hand, section 70.220 also authorizes a municipality or a political subdivision of the state to enter into a joint venture with any private person, firm, association or corporation. Incorporation under Chapter 355 does not make the private association or corporation a governmental entity. Thus, the agreement between TMC, the City, the County and the University under which the hospital was planned, constructed and is now operated belongs in this category. In contrast to the section 70.220 entity created where only governmental entities are joined together, this agreement should not convert the private individual, association or corporation into a governmental body. If we were to allow any public entity to extend the benefits of its sovereign immunity to private individuals, associations or corporations of its choice without specific statutory authority to do so, we would invite the private entity to receive the benefits of sovereign immunity (the ultimate liability insurance policy—no liability) without incurring any of

the burdens (the obligation to pay claims on behalf of the insured). Such an invitation would be at the expense of victims injured by private individuals or corporations who would have been liable for their torts but for their association with the immune public entity. We question whether the legislature contemplated the casual kind of proliferation of sovereign immunity that would result from such a broad interpretation of sections 70.220 and 537.600. It is one thing to say the king can do no wrong; it is another to allow the king's agents unlimited discretion in bringing otherwise private individuals and corporations into the king's family to enjoy this special privilege at the cost of injured tort victims.

■ On the other hand, once a not-for-profit corporation is organized under Chapter 355, the incorporators cease to fulfill any significant role in the operation of the corporation. Such a corporation really has no "owners." The persons who control the board of directors and the method by which the directors are selected dictate whether such a corporation will really function as a "public entity." In the case of TMC, there is no indication that TMC was organized as an improper effort to obtain the benefits of sovereign immunity where it would not otherwise apply. If TMC meets the first requirement of performing a governmental activity (and it does), and if its board was organized to meet the second requirement concerning control, then is there any overriding reason that its continued existence under Chapter 355 should necessarily be fatal to its qualification for sovereign immunity? One indication that incorporation under Chapter 355 is not necessarily disqualifying is the fact that REJIS, a dissolved Chapter 355 corporation that qualified for sovereign immunity, used the joint commission created under section 70.260 as both its operating entity and the controlling board. If the organization of an entity under Chapter 355 is this insignificant in

---

**1.** Section 70.220 also authorizes municipalities or political subdivisions to contract and cooperate with an elected or appointed official of any other municipality or political subdivision provided such contract or cooperative action is approved by the governing body of the unit of government in which such elective or appointive official resides. We believe this is similar to and has the same effect as the municipality or political subdivision contracting with the municipality or political subdivision, which grants its approval.

the actual operation, then it is reasonable to ask whether an entity's continued existence under Chapter 355 should disqualify it for the benefits of sovereign immunity.

Because we find that TMC does not satisfy the second requirement, it is not necessary for us to determine the precise features of the third requirement related to the creation of a public entity for purposes of sovereign immunity nor whether TMC would meet such a requirement if its control features were redesigned as discussed herein.

■ TMC also argues that it is a "municipal corporation" pursuant to *St. Louis Housing Authority v. City of St. Louis*, 239 S.W.2d 289 (Mo. banc 1951), i.e., that they are not a hybrid entity; they are the "real thing." The *St. Louis Housing Authority* Court interpreted the Housing Authority Act, section 99.080, RSMo 1949, which provided: "An authority shall constitute a municipal corporation, exercising public and essential governmental functions." *Id.* at 294. The Court determined that the housing authority, a not-for-profit "municipal corporation," had the authority required by the constitution and the applicable statutes to execute cooperation agreements with the City of St. Louis because the legislature had declared it to be a municipal corporation exercising essential governmental functions. *Id.* The Court did not, however, hold that a not-for-profit corporation can be a municipal corporation or municipality without any statutory designation as such. TMC is not a "municipal corporation" because it lacks the necessary statutory authorization.

■ For the foregoing reasons, we hold that a Chapter 355 not-for-profit corporation, which is not controlled by or answerable to public officials, public entities or the public itself, is not protected by sovereign immunity merely because it enters into cooperation agreements with political subdivisions. Therefore, TMC is not a "public entity" and is not entitled to sovereign immunity under section 537.600.

Both the Stacy and Wheeler plaintiffs contend that TMC waived the defense of sovereign immunity by failing to plead the facts upon which such a defense was based. Plaintiffs argue that TMC was thus subject to an absolute waiver of sovereign immunity pursuant to section 537.600.-1(2), RSMo Supp.1991. Because we hold that sovereign immunity does not protect TMC from liability, we do not need to address this argument.

## IV. OTHER GROUNDS ARGUED ON APPEAL

TMC also appealed on other grounds. We draw freely from the opinion written by the Honorable Gary A. Fenner of the Missouri Court of Appeals, Western District.

■ First, TMC argues that the public duty doctrine bars plaintiffs' claims. Pursuant to this doctrine, Missouri cases have consistently held that public officers are not liable for injuries or damages sustained by particular individuals resulting from a breach by the officers of a duty owed to the general public. *Berger v. City of University City*, 676 S.W.2d 39, 41 (Mo.App. 1984). These holdings are based on the absence of a duty to the particular individual as contrasted to the duty owed to the general public. *Id.* This rule applies equally to the governmental body for whom the public officers work. *Id.*

■ We have already held that TMC is not a "public entity" and its employees are not public officers. Furthermore, unlike the instant case, the cases that have utilized the public duty doctrine involve situations where there is clearly no duty owed to a particular individual. In *Lawhon v. City of Smithville*, 715 S.W.2d 300, 302 (Mo.App.1986), the court held that the creation of a municipal fire department is for the benefit of the public, and the duty is owed to the entire community. Likewise, the enforcement of a municipality's ordinances by the police is a public duty and no liability arises from the breach of that public duty. *Christine H. v. Derby Liquor Store*, 703 S.W.2d 87, 89 (Mo.App.1985).

■ In arguing that the public duty doctrine should apply in this case, TMC

focuses on the fact that although the fire originated in plaintiffs' room, patients outside the room of fire origin were also in danger and TMC employees had to act out of concern for their safety. TMC goes on to argue that the creation of a special duty towards occupants of the room of fire origin, would jeopardize the safety of persons outside the room of fire origin.

If TMC is arguing that hospitals owe only a duty to the general public, not to the individual patients, then no malpractice case could ever be brought against any hospital. However, it appears that TMC is arguing that it owed a duty only to the general public in this particular case because of the nature of the claim. TMC appears to be arguing that, in this particular situation, its role was similar to that of the fire department, and TMC is also comparing the other patients in the hospital to the general public.

The fact is that TMC owes a duty of reasonable care to all of its patients. In *Stallman v. Robinson,* 364 Mo. 275, 260 S.W.2d 743, 745 (1953), this Court stated that even though the case may not be strictly a medical malpractice case, once the hospital accepts a patient, it owes the patient a specific duty of reasonable care proportionate to the patient's needs as the patient's known condition requires. *See also Robbins v. Jewish Hosp. of St. Louis,* 663 S.W.2d 341, 346 (Mo.App.1983) (a hospital's duty is proportionate to the needs of the patient, meaning that the hospital must exercise such care and attention as the patient's condition requires); *Goodenough v. Deaconess Hosp.,* 637 S.W.2d 123, 126 (Mo.App.1982) (the known mental and physical condition of the patient must be considered in determining whether the hospital's agent exercised due care; the duty to safeguard is proportionate to the patients' needs). The public duty doctrine is inapplicable to this cause. TMC's first point is denied.

■ Second point, TMC argues that there was no evidence to prove a causal connection between various alleged acts of negligence submitted in the verdict director and patient Wheeler's death. Plaintiffs may establish causation by circumstantial evidence, which includes favorable inferences drawn from all the evidence. *Brickner v. Normandy Osteopathic Hosp., Inc.,* 746 S.W.2d 108, 116 (Mo.App.1988) (citation omitted).

Initially, TMC argues that there was no evidence to causally link the alleged negligence in allowing smoking without an approved ashtray to the death of patient Wheeler. On the date of the fire, Cheryl Stacy was smoking in room 327 and was using a juice container and soup container for her ashes. Nurse Cominos knew Cheryl was smoking and that she did not have an ashtray. The hospital's policy concerning ashtrays states that the ashtrays must be of noncombustible material, safe design and the only type approved by the hospital. When Nurse Cominos made rounds on that date, she did not see any ashtray in the room. There was evidence that the fire started in the trash can from discarded smoking materials. The jury was free to believe, from the evidence presented, that had Cheryl Stacy been given a hospital-approved ashtray, she would have discarded her cigarette in a proper ashtray and that the fire would not have occurred.

■ Next, in support of this point, TMC argues that there was no evidence to causally link the absence of a smoke detector in room 327 to patient Wheeler's death. It is undisputed that there was no smoke detector in room 327. Liberty's Fire Chief, Richard Lehman, testified that a smoke detector would have given an earlier warning in this fire and that the fire was burning one to three minutes before Nurse Schreiner initially discovered it. He further testified that smoke detectors were sensitive enough in 1986 that they would go off even before the eye would notice smoke in a room. The evidence was sufficient to submit the issue to the jury.

Finally, TMC argues that there was no evidence to causally link the death of patient Wheeler to the alleged inadequate fire training of TMC's staff. The man in charge of fire safety training at TMC, Lieutenant Walter Campbell, testified that he did not even use Exhibit 57, TMC's fire

safety manual in his orientation and training of the nurses. He testified that the hospital policy was to first remove a patient from the room and out of immediate danger in case of fire. Chief Lehman testified that the particular training received by the TMC nurses was below the standard of care and that attempting to put the fire out with linens would also be indicative of a lack of training. TMC's expert, Fire Captain James Gibson, testified that throwing dry sheets on the fire would have added to the problem by fueling the fire. The jury could have found that if TMC's nurses would have been properly trained, they would have followed their training and prevented patient Wheeler's death by removing him from the room, in accordance with their training acronym "RACE."

The record reflects that plaintiffs presented sufficient evidence of causation between the alleged acts of negligence and decedent's death to submit the issue to the jury.

■ Third, TMC argues that the jury's verdict in favor of defendant Michelle Taylor mandates the exoneration of TMC. TMC argues that it cannot be liable absent actionable negligence on the part of Michelle Taylor, its employee. TMC cites *Moran v. North County Neurosurgery, Inc.*, 714 S.W.2d 231 (Mo.App.1986), in support of its argument that there can be no judgment against the master where there is a finding of no negligence by a servant. *Moran* does stand for the proposition that "where the right to recover is dependent *entirely* on the doctrine of respondeat superior and there is a finding of no negligence by the servant there should be no judgement against the master." *Id.* at 232–33 (emphasis added). However, the *Moran* court goes on to state that "[t]his doctrine is not applicable if the liability of the employer may be predicated upon some basis other than the negligence of the exonerated servant." *Id.* at 233. TMC's liability was not predicated solely upon the conduct of Michelle Taylor. The verdict directing instructions submitted disjunctive assignments of negligence, including negligent acts by other employees and by TMC.

■ As its fourth and fifth points, TMC argues that the disjunctive nature of the verdict directors rendered them invalid. TMC argues that the multiple disjunctive nature of the verdict directors (Instructions No. 14 for the Wheeler plaintiffs and No. 9 for the Stacy plaintiffs), in combination with the verdict form, unconstitutionally diluted the Article I, Section 22(a) of the Missouri Constitution requirement that nine or more jurors concur in the verdict. Article I, Section 22(a) of the Missouri Constitution provides that "in all civil courts of record three-fourths of the members of the jury concurring may render a verdict."

In Instruction No. 14, the trial court submitted five disjunctive theories of negligence against TMC as follows:

Your verdict must be for plaintiffs Thelma Allen and Amanda Wheeler against Defendant Truman Medical Center, if you believe:

First, either:

Defendant Truman Medical Center violated its Smoking Policy, either:

by allowing smoking without an approved ashtray in Room 327; or by allowing smoking in a no smoking area;

or

Defendant Truman Medical Center failed to give adequate fire safety training to its employees concerning removal of patients from the danger of fire;

or

Defendant Truman Medical Center's employees failed to remove patient Wheeler from the danger of fire at the first opportunity;

or

Defendant Truman Medical Center failed to have a smoke detector in Room 327;

and

Second, defendant Truman Medical Center, in any one or more of the respects submitted in Paragraph First was thereby negligent;

and

Third, as a direct result of such negligence, Dale Wheeler died.[2]

The verdict directors are instructions for wrongful death with multiple negligent acts submitted, as set out in MAI 20.02. Plaintiffs were bound to follow MAI. *See Hudson v. Carr*, 668 S.W.2d 68, 71 (Mo. banc 1984) (failure to follow MAI, including the notes on use, is error).

■ According to TMC's argument, submitting cases in multiple negligent acts would always result in unconstitutional error. However, disjunctive submissions are provided for in MAI 20.02 and 17.02. As long as each submission of negligence is supported by the evidence, the submission is proper. *See Yust v. Link*, 569 S.W.2d 236, 240 (Mo.App.1978); *Bunch v. McMillian*, 568 S.W.2d 809, 811 (Mo.App.1978). The jury was properly instructed in accordance with MAI 2.04 that nine or more of the jurors had to agree in the verdict. This means that the same nine jurors must agree upon all of the elements necessary for a verdict for or against any particular party claiming damages. Thus, under the verdict director set forth above, the same nine jurors must agree upon at least one particular disjunctive element of the five disjunctive elements submitted under Paragraph First, the same nine jurors must agree that act was negligence as submitted in Paragraph Second and those same nine jurors must agree upon causation as submitted in Paragraph Third. If these jurors return a verdict in favor of the plaintiff, then those same nine jurors must also agree upon the amount of the damages. The direction in MAI 2.04 that "nine or more of you must agree in order to return any verdict" advises the jury of this fact as does the Form of Verdict that provides for one set of signatures (the nine or more who agree to all the elements) with the return of any particular verdict.

If a jury is called upon to return more than one verdict in a particular case because different parties make different claims, such as was the case in *Powell v. Norman Lines, Inc.*, 674 S.W.2d 191 (Mo.

App.1984), where one group of nine jurors returned a verdict in favor of the plaintiff and against both defendants, and another set of nine jurors apportioned fault between the two defendants. This result was proper in that case because the apportionment of fault claim was asserted by cross claims filed by the defendants pursuant to *Missouri Pac. R. Co. v. Whitehead & Kales Co.*, 566 S.W.2d 466 (Mo. banc 1978), and this was a separate claim from the plaintiff's main claim. The Form of Verdicts provided in MAI for the submission of such a case properly provide for this result by providing for separate sets of signatures by jurors for the return of the verdict on the plaintiff's claim and the return of the verdict on the apportionment of fault claim. *See* MAI, Verdict A and Verdict B, Illustration 35.05 [1983 Revision Committee Illustration] (4th ed. 1991).

The trial court did not err in submitting multiple acts under MAI 20.02. TMC's fourth point is denied.

■ TMC also argues that the Verdict B form, which was given pursuant to MAI 36.21, operates to restrict those jurors deliberating on the damage issue to the same nine jurors who "concurred" as to liability by providing only one set of spaces for the jurors to sign their names. TMC's contention is without merit. See our discussion of TMC's fourth point immediately above and of *Powell v. Norman Lines Inc.*, 674 S.W.2d 191. Moreover, TMC did not object to the verdict form, and specific objections must be made at the time the verdict forms are given to the jury. *Johnston v. Lerwick*, 738 S.W.2d 868, 869 (Mo.App.1986). TMC's fifth point is denied.

As its sixth point on appeal, TMC argues that Instruction No. 14 (set out above) is improper for several reasons. First, TMC argues that Instruction No. 14, which directed the jury to find TMC negligent if patient Wheeler had not been removed from danger "at the first opportunity," was vague and ambiguous and in irreconcil-

**2.** The verdict director of the Stacy Plaintiffs (Instruction No. 9) submitted multiple acts of negligence in the same fashion.

able conflict with Instruction No. 9 (the verdict director for the Stacy plaintiffs).

 TMC argues that the term "first opportunity" was open to interpretation by the jury to mean many different time frames in the rescue scenario, depending upon the point of view taken. TMC then goes on to argue that the alleged inconsistency in the verdict directors for each plaintiff allows the jury to use its roving commission to look at each patient's situation in a vacuum and without regard to the safety of anyone else.

However, by defining the reasonable time for removal of a patient as the "first opportunity," instead of as a specific point in time, the instruction does just what TMC argues it fails to do. It allows the jurors to determine when a patient should be removed by finding, in light of all the circumstances, when the "first opportunity" existed. The cases were consolidated because they arose out of the same set of facts, and there is no reason to believe the jury was given a roving commission to look at each patient's situation in a vacuum.

 Next, TMC argues that one of the disjunctive theories in Instruction No. 14, the one allowing a verdict for plaintiffs if TMC violated its smoking policy by allowing smoking without an approved ashtray, was unsupported by the evidence. It is true that a verdict director that submits disjunctive theories of negligence is erroneous unless the evidence is sufficient to support all of the theories. *Bushong v. Marathon Elec. Mfg. Corp.*, 719 S.W.2d 828, 831 (Mo.App.1986).

In support of its argument, TMC notes that there was evidence that there was an ashtray in room 327. However, Instruction No. 14 submits that TMC violated its smoking policy by "allowing smoking without an approved ashtray in Room 327." There was evidence indicating that Cheryl Stacy was not using a hospital-approved ashtray and that TMC personnel knew that fact but did nothing about it. Nurse Cominos admitted violating the hospital's smoking policy on the date of the fire by observing smoking and the use of a grape juice cup for an ashtray in room 327. The instruc-

tion does not focus on whether TMC supplied an ashtray to the room. There was sufficient evidence to show that smoking was allowed without an approved ashtray.

 Finally, TMC argues that Instruction No. 14 improperly equated a violation of TMC's smoking policy with negligence. TMC cites *Robinson v. St. John's Medical Center*, 508 S.W.2d 7, 13 (Mo.App.1974), for the proposition that under Missouri law, an internal policy or procedure manual does not necessarily parallel the proper standard of care for the circumstances. The court in *Robinson* states:

> Nevertheless, the manual itself would not serve to absolutely establish the existence of a joint enterprise or adventure as a matter of law or conclusively as a matter of fact; neither would it constitute *absolute* or *conclusive* evidence of the proper standard of care in the circumstances ... and violation thereof could not constitute actionable negligence unless it was a proximate cause of the casualty....

*Id.* at 13 (emphasis added).

TMC argues that the instruction improperly equates a violation of the smoking policy with negligence because the policy is not evidence of the standard of care. Chief Lehman testified that the failure to enforce hospital smoking policies concerning ashtrays and smoking in patient rooms where people were incapacitated such as room 327, was below the standard of care. In this case, there was evidence that a failure to enforce the policy was below the standard of care.

TMC's sixth point is denied.

 As its final point, TMC challenges various evidentiary rulings as prejudicial. TMC argues that the proffered testimony of Nurse Aletta Fields, as to fire training she received from other Kansas City area hospitals, should have been admitted as evidence of due care. Plaintiffs' counsel objected to the proffered evidence on the basis that it asked for an opinion without laying a proper foundation. TMC's counsel made no effort to rephrase the question and counsel's offer of proof also failed to

address foundational matters. The trial court acted within its discretion in sustaining plaintiffs' objection.

■ Next, TMC argues that plaintiffs cross-examined TMC's expert with NFPA (National Fire Protection Agency) report without first admitting expert testimony that the publication was authoritative. However, TMC's counsel made no objection to the cross-examination concerning the report. As this issue was not properly presented to or expressly decided by the trial court, it is not considered on appeal. Rule 84.13(a).

■ TMC also argues that evidence of excerpts of the 1982 Uniform Building Code (UBC) was irrelevant because the provisions did not apply to TMC, and any relevancy was overwhelmed by unfair prejudice caused to TMC. The court limited the use of the UBC to help establish the standard of care but would not allow testimony concerning whether TMC was governed by the UBC. TMC argues that the prejudice resulted from the impression left on the jury that the 1982 UBC provisions concerning sprinklers and smoke detectors defined the standard of care applicable to TMC. Plaintiffs' expert testified that it was below the standard of care to have hospital rooms without smoke detectors. The fact that the UBC requires smoke detectors was merely further evidence of the standard of care. Admission of the excerpts did not constitute reversible error.

■ TMC further argues that evidence of a December 18, 1986, smoking incident was irrelevant. TMC argues that the prior smoking incident was not "substantially similar." The incident involved a fire that occurred in a room without a smoke detector, on the same floor of the hospital, as a result of a patient smoking in his room. It occurred less than two weeks prior to the fatal fire out of which these two lawsuits arose. This incident was admissible to show the notice that defendant had of a potential smoking/fire problem. *Corley v. Kroger Grocery & Baking Co.*, 193 S.W.2d 897 (Mo.1946) (evidence that plaintiff was the third person to fall in defendant's store that day admitted on the specific issue of

notice on the part of defendant); *Dewey v. Kline's, Inc.*, 229 Mo.App. 1079, 86 S.W.2d 622, 626 (1935) (maid allowed to testify that she had seen persons stumble and fall when going into the toilet room where defendant fell, and that she had reported such occurrences); *Mick v. John R. Thompson Co.*, 77 S.W.2d 470, 475 (Mo. App.1935) (evidence admitted of prior accidents where persons had stumbled over scales located in the same place in restaurant where plaintiff stumbled over them).

■ Where the theory of recovery is negligence, any knowledge or warning that defendant had of the type of accident in which plaintiff was injured clearly aids the jury in determining whether a reasonably careful defendant would have taken further precautions under all the facts and circumstances, which include the knowledge of defendant of prior accidents. Moreover, the degree of similarity required for evidence that constitutes notice to defendant of prior similar accidents is less demanding than the similarity required for a series of prior accidents offered to show that the same accident occurred on the occasion in issue. In discussing this lower requirement of similarity, McCormick states:

> The proponent probably will want to show directly that the defendant had knowledge of the prior accidents, but the nature, frequency or notoriety of the incidents may well reveal that defendant knew of them or should have discovered the danger by due inspection. Since all that is required is that the previous injury or injuries be such as to call defendant's attention to the dangerous situation that resulted in the litigated accident, the similarity in the circumstances of the accidents can be considerably less than that which is demanded when the same evidence is used for one of the other valid purposes.

*McCormick on Evidence*, § 200 at 848 (4th ed. 1992) (footnotes omitted).

We reject TMC's contention that this notice was meaningless and therefore inadmissible because no public hospital could,

within the twelve-day period between the two fires, have designed and installed a smoke detector system. TMC's contention goes to weight and not to the admissibility of this evidence. The issue of what precautions, if any, TMC could have taken in the twelve days was for the jury. We affirm the trial court's admission of the evidence of the prior smoking occurrence.

■ Finally, TMC argues that evidence of an uncorrected portion of Michelle Taylor's deposition testimony injected post-accident remedial measures into evidence. TMC's counsel did not object to this testimony at trial. Because this issue was not properly presented to or expressly decided by the trial court, it is not considered on appeal. Rule 84.13(a).

Plaintiffs' point is denied.

## V. POST–JUDGMENT INTEREST

Plaintiffs claim they are entitled to post-judgment interest from November 8, 1989, the day the jury returned its verdict. Defendant TMC contends post-judgment interest does not begin to accrue until July 21, 1991, the original handdown date of this opinion.

Defendant TMC did not raise the issue of sovereign immunity by a motion to dismiss or a motion for summary judgment prior to trial. When evidence was offered on this issue during the trial, the court determined that this was a question of law for the court and not an issue for the jury. At this time, the court stated on the record:

I think this jury is going to become hopelessly muddled if we ask them to try to resolve this issue [sovereign immunity]. I want to submit the liability issue to this jury and then after that is over, if there is a verdict against Truman, on posttrial motions, if I decide that it was improper that they should not have been submitted to them, I would take that away and the case would be in a posture to go to the appellate court....

Trial Tr. p. 1006. At the conclusion of the evidence, the trial court indicated that it would take the sovereign immunity issue as part of the post-trial motions if that issue was still pertinent after the deliberations of the jury.

The jury returned verdicts on November 8, 1989, in favor of the Wheeler plaintiffs in the amount of $500,000 and in favor of the Stacy plaintiffs in the amount of $278,-927.98. Because TMC is a health care provider, the verdict forms require the jury to itemize damages. MAI 36.21. The jury in the Wheeler case allocated $312,000 of the $500,000 verdict to future economic damages. When this verdict was returned, the trial court concluded there was no evidence to support future economic damages. The court sent the jury back to deliberate with a modified verdict form with future economic damages marked out. *See* MAI 2.06. When the jury returned the modified verdict form, the $312,000 for the future economic damages had been moved to future non-economic damages. Therefore, the total verdict remained $500,000. The trial court entered judgment as of November 8, 1989, in accordance with the jury verdict on the modified form. See § 510.340, RSMo, which provides: "The judgment shall be entered as of the day of the verdict."

Following the jury's verdict, the trial court again referred to the sovereign immunity issue. The court requested that the parties include it in their post-trial motions. The court indicated that it would then rule on that issue. Neither party objected to this procedure. TMC filed its motion for judgment notwithstanding the verdict based on the sovereign immunity issue, along with written suggestions in support thereof and other post-trial motions. All parties briefed the issue. Counsel for defendant TMC waived any further evidentiary hearing.

On February 14, 1990, the trial court granted TMC's motion for judgment notwithstanding the verdict. This order specifically stated, "TMC's motion for judgment notwithstanding the verdict due to sovereign immunity is GRANTED, and the judgments previously entered against Truman Medical Center are set aside." At that same time, the trial court entered an order stating that it had concluded that it should have accepted the jury's first ver-

dict but should have excluded the future economic damages because they were not supported by the evidence. Thus, it ruled that if there was a reversal on the sovereign immunity issue, then the Wheeler verdict would be in the amount of $188,000.

The leading case on the accrual of postjudgment interest for a verdict returned in favor of plaintiff, later set aside and finally reinstated, is *Crystal Tire Co. v. Home Service Oil Co.*, 507 S.W.2d 383 (Mo.1974). In *Crystal Tire*, the jury returned a verdict in favor of plaintiff and against both defendants. The trial court refused to accept the verdict and directed the jury to continue its deliberations. The next day the jury returned a second verdict in favor of plaintiff and against one defendant but in favor of the second defendant. The judgment was entered on the second verdict. On appeal, this Court held that the trial court erred in refusing to accept the first verdict. This Court reversed the judgment and remanded with directions to the trial court to accept the first verdict and enter judgment in accordance therewith. It also provided that Crystal Tire Company "be restored to all things which it has lost by reason of said judgment...." *Id.* at 384. The Court held that even though the judgment was not entered against the second defendant until after the appeal, it is entered "as of the date of the verdict and its bears interest from that date." *Id.* In *Crystal Tire*, we quoted from *Lieffring v. Birt*, 356 Mo. 1092, 204 S.W.2d 935, 937 (1947), that under section 510.340 "the judgment is *rendered* upon the verdict when the verdict is returned and its validity is not affected by the delay of the clerk in *entering* it on the court record, or by an omission altogether to record it in pursuance to statutory direction." *Id.* In the *Lieffring* case, no judgment was entered of record until after the appeal. Nevertheless, when the judgment was entered, it was entered as of the date of the verdict and interest ran from that date.

Defendant TMC contends that the trial court, by deferring the sovereign immunity issue to the post-trial rulings, bifurcated the trial under section 510.180. Furthermore, defendant claims section 511.020 defines "judgment" as "the final determination of the right of the parties in the action." Defendant asserts that the "judgment" entered by the trial court on November 8, 1989, was not a final judgment because one portion of the bifurcated trial (the sovereign immunity issue) remained to be determined. Defendant says that while the court can grant separate trials on issues, "the judgment upon each separate finding shall await the trial of all the issues." *McCreary v. Bates*, 238 Mo.App. 30, 176 S.W.2d 298, 301 (1943).

Defendant's claim of a bifurcated trial is without merit. The trial court proposed that the sovereign immunity issue be ruled as part of the post-trial motions; there was no objection to this procedure by any party. The trial court's handling of the sovereign immunity issue did not purport to be and did not take the form of a bifurcated trial. The court did not order a separate trial of any separate issue, nor did it refer in any way to a bifurcated trial. The trial court's resolution of a question of law whether it be before trial (motion to dismiss or motion for summary judgment), during trial (motion for directed verdict), or after trial (judgment notwithstanding the verdict or other post-trial motion) does not constitute a "bifurcated trial." The "bifurcated trial" label is not applicable and would not help the defendant's argument in any event.

Likewise, defendant's contention that the judgment entered as of November 8, 1989, was not a "final" judgment is without merit. There is no such thing as a "final judgment" or a "non-final judgment." When a judgment is entered, it is always non-contingent and absolute on its face even though it may be subject to some future modification by the trial court or on appeal. Section 510.340 requires that any judgment entered, whether it be before or after appeal, is "entered as of the day of the verdict." Even if the court had not entered a judgment, when judgment is entered, it is to be entered as of November 8, 1989, (the date of the verdict) and is to

accrue interest from that date. *See* § 510.-340.

The same rule for computing interest applies to the final verdict in favor of the Wheeler plaintiffs and against the defendant TMC even though the trial court did not immediately accept the first verdict. The fact that the trial court did not accept the portion of the verdict other than future economic damages until after the final resolution of the sovereign immunity issue is of no consequence because, when judgment is finally entered in favor of the Wheeler plaintiffs and against defendant TMC for the correct amount ($188,000), such judgment shall be entered as of November 8, 1989 (the date of the verdict). *See* § 510.-340. This judgment also bears interest at the legal rate from that date.

We reverse the trial court's granting of TMC's motion for judgment notwithstanding the verdict. We remand the cause to the trial court to enter judgment as of November 8, 1989, in favor of the Stacy plaintiffs and against the defendant TMC in the amount of $278,927.98, together with interest thereon at the legal rate from November 8, 1989, and in favor of the Wheeler plaintiffs against the defendant TMC in the amount of $188,000, together with interest thereon at the legal rate from November 8, 1989, and for the costs of this action.

ROBERTSON, C.J., COVINGTON, HOLSTEIN and BENTON, JJ., and RENDLEN, Senior Judge, concur.

CHARLES B. BLACKMAR, Senior Judge, concurs in separate opinion filed.

PRICE, J., not sitting because not a member of the Court when case was submitted.

CHARLES B. BLACKMAR, Senior Judge, concurring.

I concur, with some reluctance.

As the principal opinion points out, this Court abolished sovereign immunity by the decision in *Jones v. State Highway Commission*, 557 S.W.2d 225 (Mo. banc 1977).

Had this holding remained in force, the doctrine of *Zummo v. Kansas City*, 285 Mo. 222, 225 S.W. 934 (Mo.1920), would have been abrogated. But the General Assembly, in its wisdom, undid the effect of *Jones* by legislation that reinstated sovereign immunity "as existed at common law in this state prior to September 12, 1977," with specified exceptions. The exceptions do not include the provision of health care, except in the infrequent instances in which the dangerous condition of property exception can be established. The Court has made it clear that sovereign immunity attends the provision of hospital facilities by a public entity, *State ex rel. Cass Medical Center v. Mason*, 796 S.W.2d 621 (Mo. banc 1990), and has resisted numerous attempts to hold public hospitals liable for malpractice. In so doing we serve the legislature's purpose, whatever our views as to the desirability of imposing such liability might be.

The TMC arrangement, on its face, is a consortium among the City of Kansas City, Jackson County, and the University of Missouri to combine their resources in health care provision. Inasmuch as each of these entities would be immune from liability for health care directly provided, the consortium, properly established, should likewise be immune. *State ex rel. Trimble v. Ryan*, 745 S.W.2d 672 (Mo. banc 1988).[1] This is especially so in the light of the constitutional and statutory provisions in the principal opinion encouraging cooperation among governmental units.

But, as the principal opinion points out, the public entities surrendered control of the TMC operation to a self-perpetuating Board of Trustees. Thus the operation is indistinguishable from a private, charitable hospital, which now enjoys no tort immunity. *Abernathy v. Sisters of St. Mary's*, 446 S.W.2d 599 (Mo. banc 1969). Although the Court considered it wise to abolish both charitable and sovereign immunity, the legislature, which has the final say, disagreed as to the latter. Divorced from public con-

1. My disagreement with that opinion has noth-

ing to do with the joint participation feature.

trol, TMC partakes more of the charitable than the sovereign model.

The circumstance that the public agencies chose a Chapter 355 corporation as appropriate means for carrying out their public function should not be determinative. *State ex rel. Regional Justice Information Service Commission v. Saitz,* 798 S.W.2d 705 (Mo. banc 1990). The essential issue is one of control. If public control remains, speculation that a political subdivision might not be able to create a "sovereign" is unnecessary. *Regional Justice* shows that public agencies may use Chapter 355, if the element of control is present.

It is said that one of the reasons for creating the separate entity was "to alleviate political interference...." But we must remember that politics provide the means for participation in democratic government. An agency that is free from politics is not a public entity. Those who engage in blanket denouncements of politics and politicians because of the misdeeds of some should consider the alternative, which would limit citizen participation in the governmental process. Attempts to lodge public decisions in the wise and the good, free from "political interference," may have serious consequences for the government of the people. Here, however, the only apparent consequence is the change from the sovereign to the charitable mold.

I find the opinion in *Truman Medical Center, Inc. v. NLRB,* 641 F.2d 570 (8th Cir.1981), expressed with Judge Hanson's customary soundness and clarity, interesting and similar but not dispositive. Congress establishes the framework for the National Labor Relations Board, but the Board exists for a special purpose. It possesses substantial discretion in determining when it will accept jurisdiction. Its acceptance or denial of jurisdiction does not necessarily control our decisions about sovereign immunity.

Nor is sovereign immunity impinged if a governmental body solicits or receives contributions from the public. This method of financing is becoming increasingly common, especially for public educational institutions, which do not receive adequate support from tax revenues. The receipt of such contributions should not jeopardize the enjoyment of sovereign immunity.

With these observations, I concur.