956 S.W.2d 249 (1997)
CASUALTY RECIPROCAL EXCHANGE, Appellant,
v.
MISSOURI EMPLOYERS MUTUAL INSURANCE COMPANY, et al., Respondents.
No. 79471.
Supreme Court of Missouri, En Banc.
November 25, 1997.
*251 Richard P. Hutchison, Kansas City, for Appellant.
Jeremiah W. (Jay) Nixon, Atty. Gen., John R. Munich, Deputy Atty. Gen., Michael L. Boicourt, Gary L. Gardner, Laura M. Vogel, Asst. Attys. Gen., Jefferson City, Douglas S. Laird, W. Russell Welsh, Kansas City, Thomas W. McCarthy, III, James Owen, Chersterfield, for Respondents.
John E. Bardget, Sr., James B. Deutsch, Matthew D. O'Leary, St. Louis, R. Christoper Abele, Diane A. Gibson, Kansas City, for amicus curiae.
COVINGTON, Judge.
Appellant, Casualty Reciprocal Exchange (CRE), challenges the constitutionality of the Missouri Employers Mutual Insurance Company Act (Act), which created respondent, Missouri Employers Mutual Insurance Company (MEM). Sec. 287.900 et seq.[1] CRE claims that MEM is a private corporation that was created by a special law in violation of the Missouri Constitution. Mo. Const. art. XI, sec. 2; Mo. Const. art. III, secs. 40(28), 40(30). CRE also alleges that the Act's five million dollar loan authorization, secs. 287.919.1, 287.690.2, and its authorization of MEM's revenue bonds, sec. 287.919, violate the Missouri Constitution. Mo. Const. art. III, secs. 38(a), 39(1), 37. CRE further maintains that the Act infringes upon CRE's rights to equal protection and deprives CRE of its property without due process of law.
The trial court granted respondents' (CRE also named the Missouri Director of Insurance (Director) in the action) motion for summary judgment concluding that because MEM is a public corporation, the Act does not violate the Missouri Constitution. The trial court also determined that the Act did not violate CRE's right to equal protection or deprive it of its property without due process. The judgment is affirmed.

I.
The facts, as noted by the trial court, are presented here in detail. In 1992, the Missouri General Assembly created the Workers' Compensation Labor/Employer Advisory Committee (the Advisory Committee) to examine the workers' compensation system in Missouri and to assess the system's ability to ensure employers of stable, fair, and predictable workers' compensation costs. According to the legal file, in its majority recommendations the Advisory Committee reported the following finding:
Currently, employers may self insure their workers' compensation liability or insure such liability through a private carrier.

*252 For those employers unable to obtain insurance in the voluntary market, they are placed in the residual market. Many times employers, especially small employers, and particularly small employers in the residual market, do not receive proper and adequate service from their insurance carriers. A competitive state fund, run like a mutual insurance company, could take a position of leadership in the provision of service to employers and injured workers in the reform and improvement of the workers' compensation system.
The Advisory Committee then made the following recommendation, as noted in the legal file:
The General Assembly should establish a state mutual insurance company (the fund), which would not be a state agency, that will provide employers a competitive source of workers' compensation insurance.
In response to the recommendations of the Advisory Committee, the general assembly enacted the legislation, in 1993, that created MEM. The Act is based on a "model" law developed by the American Association of State Compensation Insurance Funds that addresses competitive state workers' compensation funds. The stated purpose of MEM is to insure Missouri employers against liability for workers' compensation, occupational disease, and employers' liability coverage. Sec. 287.902.
The Act states that MEM is "an independent public corporation" that should be organized and operated as a domestic mutual insurance company. Sec. 287.902. MEM has the powers granted a general not for profit corporation. Id. The Act mandates that MEM give preference to employers that develop an annual premium of not greater than ten thousand dollars. Id. The Act encourages MEM to use flexibility and experimentation in the development of the types of policies and coverages offered to employers, but it makes this creativity subject to the approval of the Director. Id. The Act provides for MEM's five member board of directors, sec. 287.905.1, which is vested with the power to perform all acts necessary or convenient in the administration and business of the company. Sec. 287.907.2. The Act provides that the board is initially appointed by the governor. Sec. 287.905.1. The Act allows MEM's policy holders to appoint successor board members. Id. The board members, officers, and employees of MEM are protected by official immunity. Sec. 287.909.4. The board of MEM must submit an annual, independently audited report to the governor and general assembly. Sec. 287.920.2.
The Act aids the initial capitalization of MEM by providing that the director of the division of workers' compensation may make a start-up loan to MEM of up to five million dollars. Secs. 287.690.2, 287.919.1. The Act also authorizes MEM to issue revenue bonds, payable solely from premiums received from insurance policies and other revenues generated by the company. Sec. 287.919.2. MEM is further required by the Act to set aside from these revenues an amount of money sufficient to pay the principal and interest on such bonds as they become due each year. Sec. 287.919.9. The Act authorizes the Director to exempt MEM from laws and regulations that cover private insurance carriers. Sec. 287.920.5.
The Act designates MEM as a member of, and subject to assessments from, the Missouri Property and Casualty Insurance Guaranty Association (MIGA). Sec. 287.902. MIGA's membership consists of all insurers transacting certain types of insurance business within the state. Sec. 375.772.1., .2(4), 375.773.2. CRE is also a member of MIGA.
MIGA establishes a fund from the assessments collected from its members. Sec. 375.775.1(3). MIGA uses the proceeds from this fund to pay covered claims after an insurer becomes insolvent. Sec. 375.775.1(1). To pay MIGA's obligation after an insolvency occurs, MIGA assesses member insurers separately in proportionate amounts according to the type of insurance account in which they participate. Sec. 375.775.1(1),(3). The Act, therefore, would cause the members of MIGA, such as CRE, to bear the responsibility if MEM became insolvent. Sec. 287.902. Further details are presented below regarding the various provisions that limit the responsibility of MIGA's members should MEM become insolvent.

*253 II.
CRE contends that the Act violates the Missouri constitutional provisions that prohibit creating corporations by special law and granting a corporation special or exclusive privileges and exemptions where a general law can be made applicable. See Mo. Const. art. XI, sec. 2; Mo. Const. art. III, secs. 40(28), 40(30). The dispositive issue for several of CRE's points on appeal is whether MEM is a public corporation. If MEM is a public corporation, then CRE's arguments that the Act violates the Missouri Constitution's special law prohibitions and CRE's constitutional challenges regarding the financing aspects of the Act are not meritorious.
The constitutional prohibitions against creating corporations by special law and against granting corporations special or exclusive privileges and exemptions where a general law can be made applicable do not apply to public corporations. See City of Webster Groves v. Smith, 340 Mo. 798, 801, 102 S.W.2d 618, 619 (1937) (holding that an act imposing a special excise tax on `corporations' was not applicable to a municipal corporation engaged in the distribution and sale of water); State ex rel. Highway Comm'n v. Bates, 317 Mo. 696, 705, 296 S.W. 418, 422 (banc 1927) overruled on other grounds 850 S.W.2d 100 (Mo. banc 1993)(finding the State Highway Commission to be a public corporation, though possessing many attributes of a private corporation, and not in violation of the predecessor to article XI, section 2, though created by special law); In re East Park Dist. of Kansas City, 361 Mo. 829, 832, 237 S.W.2d 118, 120 (banc 1951)(interpreting the predecessor to article XI, section 2 to apply only to private or business corporations and not municipal corporations).
Because corporations can be classified generally as public or private, this Court noted in Smith, when analyzing a municipal corporation, that "where the term `corporation' is used in our Constitution it uniformly refers to private or business organizations of individuals," not to public corporations. Smith, 340 Mo. at 801, 102 S.W.2d at 619; see also Spitcaufsky v. Hatten, 353 Mo. 94, 132, 182 S.W.2d 86, 109 (banc 1944), overruled on other grounds, 555 S.W.2d 293 (Mo. banc 1977)(finding that the term "corporation" as used in the Missouri constitution refers only to private corporations as distinguished from those that are public).
To decide if the Act violates the special law prohibitions of the Missouri Constitution, therefore, this Court must first decide whether MEM is a public corporation. The issue of whether an organization constitutes a public entity, or public corporation, is one that has not previously been directly addressed by this Court. There is substantial authority, however, to provide guidance.
According to this Court's commentary on the concept in Bates, a public corporation is an entity having the powers of a corporation, established and controlled by the state for a public purpose. Bates, 317 Mo. at 701, 296 S.W. at 420. Recently, this Court further and thoroughly developed the indicia of a public entity/public corporation in Stacy v. Truman Medical Center, 836 S.W.2d 911, 917 (Mo. banc 1992). In Stacy, this Court was asked to determine whether Truman Medical Center (TMC) was a "public entity" entitled to the protections provided by sovereign immunity.[2] In identifying the features that characterize a "public entity" in this context, this Court looked first to Truman Medical Center, Inc. v. N.L.R.B., 641 F.2d 570 (8th Cir.1981)(considering whether TMC was a "political subdivision" of the state for purposes of determining whether the National Labor Relations Board had jurisdiction over TMC), and then to a series of Missouri cases that presented the "public entity" issue specifically in the context of sovereign immunity.
In Stacy, this Court noted that this series of sovereign immunity cases had determined that the entities at issue were "public entities" within the context of sovereign immunity under section 537.600, RSMo. Supp.1991. In State ex rel. Regional Justice Information Service Commission (REJIS) v. Saitz, 798 *254 S.W.2d 705, 707 (Mo. banc 1990), this Court found that REJIS, a joint commission designed to manage the database of criminal arrests and dispositions, was responsible to the City of St. Louis and St. Louis County, and, consequently, was a "public entity." In State ex rel. Trimble v. Ryan, 745 S.W.2d 672, 674 (Mo. banc 1988), this Court found that the Bi-State Development Agency was a "public entity" because the Bi-State commissioners from Missouri were selected by the governor with the advice and consent of the senate and were required by law to approve all actions of the agency and report the agency's operations and transactions to the governor. Id; sec. 70.370, RSMo 1986. Bi-State was created to plan, construct, own, operate and maintain bridges, airports and terminals and to coordinate street, highways, parking areas, water supply, and sewage and disposal works, recreational and conservation facilities and projects. Id. at 674. Finally, in State ex rel. Cass Medical Center v. Mason, 796 S.W.2d 621 (Mo. banc 1990), as interpreted in Stacy, this Court found that Cass Medical Center was a public entity with the requisite public control because the elected trustees of Cass Medical Center were controlled by the public itself, and the trustees were required to report to the county commission, which is composed of elected officials. Stacy, 836 S.W.2d at 919.
On the basis of Truman Medical Center, Inc. v. N.L.R.B., REJIS, Trimble, and Cass Medical Center, this Court delineated the features common to "public entities." Stacy, 836 S.W.2d at 919. These features include the following: (1) the governmental or public entity must be formed by government itself or by the voters acting as a group; (2) the entity must be controlled by and directly answerable to one or more public officials, public entities, or the public itself; and (3) the entity must perform a service traditionally performed by the government. Id. A public entity/corporation that possesses all three of the foregoing characteristics is a public corporation for purposes of sovereign immunity.
In the instant case, these factors are useful for identifying a public entity/corporation with the exception of the third element. As this Court noted in Stacy, the manner in which government traditionally acted is of limited importance in identifying a public entity/corporation in modern times because of the "broad range of activities in which the government is involved...." Id. Moreover, what is important in this context is whether a corporation is "established and controlled by the state for public purposes," not whether the protection historically afforded the sovereign should apply to a government's current activities. Bates, 317 Mo. at 701, 296 S.W. at 420. Consequently, there is no reason in this case for an independent requirement that a public corporation perform actions that government has traditionally performed in the past. The more important requirement is that the corporation be created and controlled for a public purpose.
Applying the pertinent Bates and Stacy analyses for determining a "public entity" to the facts presented here, this Court concludes that although MEM is not precisely the same as other Missouri public entities or corporations, MEM is a public corporation, consistent with the general assembly's denomination of it as an "independent public corporation" in section 287.902.
First, MEM is created by the government. The general assembly and the governor created MEM and set the terms of its existence. Sec. 287.902.
Second, the Act provides for the public control of MEM that is required of public corporations. See sec. 287.902, 287.920.2. MEM is controlled by the state and is directly answerable to one or more public officials, public entities, or the public itself. See secs. 287.902, 287.905.1, 287.920.2. The Act requires MEM to make comprehensive reports to the governor and the general assembly annually. See sec. 287.920.2; see Jasper County Farm Bureau v. Jasper County, 315 Mo. 560, 567, 286 S.W. 381, 384 (1926) (finding that county farm bureau was a "public county institution" because Farm Bureau Act mandated that the bureau make monthly and annual reports to the county court). MEM must insure Missouri employers for liability against workers' compensation while the Act remains in existence. Sec. 287.902. Thus, MEM cannot elect to go out of business or to *255 remain in business. See id. Conversely, if the Act is repealed, MEM must cease to insure Missouri employers. See id. It follows necessarily that the general assembly and the governor can abolish MEM and set the terms of its dissolution.
Although the Act satisfies the public control element of the public corporation analysis in substantial part, there is one respect in which the Act fails to conform to the requirements that must be satisfied in order for MEM to be deemed a public corporation. Initially, the governor, with the advice and consent of the Senate, appoints MEM's five member board of directors. Sec. 287.905. The initial appointment of the board is consistent with the requirement of control by public officials. At the expiration of the term of any member, however, the Act provides that "the company's policyholders shall elect a new director...." Id. This ability of the policyholders to elect successor members of the board undercuts the public characteristics of the board. As Stacy makes clear, if control is vested in an independent board, accountability to the public officials or to the general public is diminished. Stacy, 836 S.W.2d at 919. This is not the kind of accountability to public officials or to the general public that is required to maintain MEM's status as a public corporation.
Review of the record with respect to composition of MEM's board fails to show that a majority of members of the board have not been appointed by the governor with the advice and consent of the Senate. As a consequence, the composition of the board does not defeat the requirement for control by public officials. With respect to public control, therefore, MEM's status is that of a public corporation and will continue as such for so long as the governor or some other public official or the general public continues to appoint at least a majority of the board.
Finally, MEM was created by the legislature for a specific public purpose"insuring Missouri employers against liability for workers' compensation...." See sec. 287.902. MEM serves to remedy the problem faced by employers in the residual market and thereby improves the workers' compensation system in Missouri. MEM further performs a public service of formulating a workplace safety program for all policyholders, developing written workplace accident and injury reduction plans, and assisting policyholders to obtain a reduction in accidents. See secs. 287.917.1, .2, .4. MEM must operate only to be self-supporting, not to generate profits. See sec. 287.910. MEM must provide safety programs for all its clients. See sec. 287.917.1. MEM may write only workers' compensation insurance, and it must give a preference to small employers who were previously relegated to the reciprocal workers' compensation insurance market. See sec. 287.902. The foregoing features satisfy the public purpose element of the analysis.
The Act creating MEM establishes an entity that is formed by the government. The Act provides in nearly all respects for the public control necessary for a public corporation, and nothing of record indicates that MEM is other than an entity controlled by and directly answerable to one or more public officials, public entities, or the public itself. MEM fulfills the requirement that the entity be created for a public purpose. This Court concludes, therefore, that MEM is a public corporation.[3]

III.
CRE also contends that the Act's five million dollar loan authorization to MEM violates the constitutional provisions that prohibit the general assembly from granting public money or lending public credit to private persons or corporations. Mo. Const. art. III, Secs.38(a), 39(1).[4] These two sections *256 of the Missouri constitution prohibit granting public money or lending public credit to a person, association, or "corporation." Section 38(a) specifically refers to "any private corporation." Mo. Const. art. III, sec. 38(a).
As previously noted in Smith, other than for a municipal corporation, "where the term `corporation' is used in our Constitution it uniformly refers to private or business organizations of individuals." Smith, 340 Mo. at 801, 102 S.W.2d at 619. Because MEM is not a municipal corporation, nor a private or business organization, the grant of public money to MEM is not to a person, association, municipal or other corporation within the meaning of sections 38(a) and 39(1). The Act's loan authorization to MEM does not, therefore, offend these provisions of the Missouri Constitution.

IV.
CRE also alleges that the Act's provision authorizing the board of MEM to issue revenue bonds violates article III, section 37 of the Missouri Constitution, which prohibits the general assembly itself from contracting or issuing bonds or from authorizing the contracting of another except in specifically listed circumstances that do not apply here.[5] CRE contends that MEM is not a government entity entitled to be authorized by the general assembly to issue revenue bonds. The finding that MEM is a public corporation is dispositive of this argument. The allegation is without merit.

V.
CRE also maintains that the Act's authorization of a five million dollar start-up loan to MEM, MEM's waivers from certain solvency and surplus requirements that were provided by the Director under section 287.920.5, and MEM's membership in MIGA violate CRE's rights to equal protection and due process. In analyzing equal protection and due process claims, this Court first must determine whether the alleged classification burdens a "suspect class" or impinges upon a "fundamental right." See Mahoney v. Doerhoff Surgical Servs., Inc., 807 S.W.2d 503, 512 (Mo. banc 1991). "Suspect classes" are classes, such as those based upon race, national origin, or illegitimacy that because of historical reasons "command extraordinary protection from the majoritarian political process." Id. (quoting Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 313, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976)). "Fundamental rights" include the rights to free speech, to vote, to freedom of interstate travel, as well as other basic liberties. Mahoney, 807 S.W.2d at 512 (citing Kramer v. *257 Union Free School Dist., 395 U.S. 621, 626, 89 S.Ct. 1886, 1889, 23 L.Ed.2d 583 (1969)).
CRE, a private insurance company, is not a suspect class or part of one. CRE alleges that the Act and the waiver from certain solvency and surplus requirements deprive CRE of the right to "participate in the insurance business `as others may'." The right to participate in the insurance business as others may is not a fundamental right. Further, MEM's membership in MIGA and the provision mandating that the members of MIGA are obligated to the extent of MEM's covered claims should MEM become insolvent do not deprive CRE of a fundamental liberty or property right. First, an assessment against a member of MIGA is made only after an insolvency has occurred and covered claims have been identified. Sec. 375.775.1. Because no insolvency has occurred or immediately threatens here, this issue is not ripe for review. In examining the provisions of the MIGA act that would operate in the event of MEM's insolvency, however, this Court determines that adequate safeguards exist against depriving members of a fundamental property right. These safeguards are as follows: assessments to members are in proportionate amounts; assessments are subject to a yearly ceiling, or cap; an assessment may be deferred if it would cause the member's capital or surplus to fall below the amount required for a certificate of authority; assessments shall be refunded or credited if increased because of other members' deferments; and for its assessment, each member is entitled to a credit against its premium tax liability. Secs. 375.775.1(3), 375.774.1, 375.774.3.
Because the Act's classification and provisions do not burden a suspect class or impinge upon a fundamental right, the second portion of the analysis under both the equal protection and due process clauses is whether the Act is rationally related to a legitimate state purpose. Mahoney, 807 S.W.2d at 512; see also Blue Cross Hosp. Serv., Inc. v. Frappier, 681 S.W.2d 925, 930 (Mo. banc 1984), vacated and remanded, 472 U.S. 1014, 105 S.Ct. 3471, 87 L.Ed.2d 608 (1985), readopted as published, 698 S.W.2d 326 (Mo. banc 1985). Under this analysis, the challenger has the burden to show that a legislatively created classification does not have a rational basis. If the legislative judgment is "at least debatable, the issue settles on the side of validity." Mahoney, 807 S.W.2d at 512-13 (quoting United States v. Carolene Products Co., 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938)).
The Act creating MEM, MEM itself, the Act's authorization of the Director to except MEM from the provisions of the statutes that relate to private insurers, the Director's subsequent temporary waiver for MEM of solvency and surplus requirements, and MEM's membership in MIGA are rationally related to controlling the cost of workers' compensation insurance premiums to Missouri employers and reducing the size of the residual market in Missouri. Because controlling the cost of workers' compensation premiums and reducing the size of the residual market are legitimate state interests, CRE's rights to equal protection and due process are not violated.

VI.
In summary, MEM is a public corporation. As such, it does not come within the special law prohibitions of the Missouri Constitution, nor does the Act's loan authorization to MEM or its authorization to MEM to issue revenue bonds violate the Missouri Constitution. None of CRE's additional claims of unconstitutionality is meritorious.

VII.
The judgment is affirmed.
BENTON, C.J., PRICE, LIMBAUGH, ROBERTSON and HOLSTEIN, JJ., and REINHARD, Special Justice., concur.
WHITE, J., not sitting.
NOTES
[1] All references to statutes are to RSMo 1994 unless indicated otherwise.
[2] In Stacy, this Court held that TMC was not a "public entity" because the majority of the board members "were neither appointed by nor subject to removal by public officials or the general public." Id. at 919.
[3] CRE contends that MEM is a quasi-public, rather than a public corporation. A quasi-public corporation is a corporation for private gain that renders, at least in part, public service. Bates, 296 S.W. at 422. MEM is not a quasi-public corporation. A public entity/corporation that satisfies the pertinent analyses in Stacy and Bates is a public, not a quasi-public, corporation.
[4] Section 38(a). Limitation on use of state funds and creditexceptionspublic calamity blind pensionsold age assistanceaid to childrendirect reliefadjusted compensation for veteransrehabilitationparticipation in federal aid. The general assembly shall have no power to grant public money or property, or lend or authorize the lending of public credit, to any private person, association or corporation, excepting aid in public calamity, and general laws providing for pensions for the blind, for old age assistance, for aid to dependent or crippled children or the blind, for direct relief, for adjusted compensation, bonus or rehabilitation for discharged members of the armed services of the United States who were bona fide residents of this state during their service, and for the rehabilitation of other persons. Money or property may also be received from the United States and be redistributed together with public money of this state for any public purpose designated by the United States. Section 39. Limitation of power of general assembly. The general assembly shall not have power:

(1) To give or lend or to authorize the giving or lending of the credit of the state in aid or to any person, association, municipal or other corporation;.
[5] Section 37. Limitation on state debts and bond issues. The general assembly shall have no power to contract or authorize the contracting of any liability of the state, or to issue bonds therefor, except (1) to refund outstanding bonds, the refunding bonds to mature not more than twenty-five years from date, (2) on the recommendation of the governor, for a temporary liability to be incurred by reason of unforeseen emergency or casual deficiency in revenue, in a sum not to exceed one million dollars for any one year and to be paid in not more than five years from its creation, and (3) when the liability exceeds one million dollars, the general assembly as on constitutional amendments, or the people by the initiative, may also submit a measure containing the amount, purpose and terms of the liability, and if the measure is approved by a majority of the qualified electors of the state voting thereon at the election, the liability may be incurred, and the bonds issued therefor must be retired serially and by installments within a period not exceeding twenty-five years from their date. Before any bonds are issued under this section the general assembly shall make adequate provision for the payment of the principal and interest, and may provide an annual tax on all taxable property in an amount sufficient for the purpose.