

# In the Missouri Court of Appeals
# Eastern District

DIVISION FIVE

| | | |
|---|---|---|
| BANK OF WASHINGTON, | ) | No. ED113056 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court |
| | ) | of Franklin County |
| vs. | ) | |
| | ) | Honorable Jason H. Lamb |
| LAND CLEARANCE FOR | ) | |
| REDEVELOPMENT AUTHORITY OF THE | ) | |
| CITY OF ST. LOUIS, and LCRA HOLDINGS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Respondents. | ) | FILED: October 7, 2025 |

This appeal arises after years of litigation initiated by the Bank of Washington over agreements related to property redevelopment on the north side of the City of St. Louis, which were made in anticipation of the National Geospatial-Intelligence Agency ("the NGA") relocating a facility to that area. The Bank asserted in its petition that the Land Clearance for Redevelopment Authority of the City of St. Louis ("the LCRA") and LCRA Holdings Corporation ("LCRA Holdings") breached those agreements. The circuit court entered summary judgment on the breach of contract claims in favor of the defendants, and the Bank appeals. We affirm that judgment because the undisputed facts negate certain elements of those claims as they were pled in the Bank's petition.

The Bank also asserted tort claims against the LCRA and LCRA Holdings. The Bank appeals the circuit court's summary judgment in favor of LCRA Holdings on the ground that it

was entitled to sovereign immunity. We reverse that judgment because LCRA Holdings failed to demonstrate it is enough like a public entity to be entitled to sovereign immunity.

## Background

The agreements at issue stem from efforts to attract the NGA to construct a new facility on the north side of the City in an area that had been declared blighted and in need of redevelopment. Having identified a proposed building site in that area, the NGA required the land to be owned by a single party without any liens encumbering the property. To comply, the City authorized the LCRA—a "public body corporate and politic" created by statute—to acquire through its powers of eminent domain or otherwise all of the property within the proposed site. To lessen its burden, the LCRA created LCRA Holdings, a nonprofit corporation organized to acquire property for use in the economic development activities of the City and the LCRA.

Some of the property within the proposed NGA site was owned by Northside Regeneration, LLC ("Northside"), which had an existing agreement with the City regarding redevelopment of Northside's land ("the Existing Redevelopment Agreement"). The Bank had financed Northside's purchase of the property, and its loans were secured by a blanket deed of trust. In 2016, the LCRA and LCRA Holdings (collectively, "the LCRA parties") entered into a Purchase and Sale Agreement ("the PSA") with Northside and the Bank, under which LCRA Holdings acquired Northside's property within the proposed NGA site, the Bank released its liens on that property, and Northside acquired additional properties in the vicinity of the NGA site. At the same time, the LCRA parties, Northside, and the Bank entered into a Future Assurances Agreement ("the FAA"), which provided, in relevant part:

> 2.1 The parties will cooperate with each other toward the development of projects in the vicinity of the NGA site.
>
> . . . .

2

4. Second Amended Redevelopment Agreement. Northside and LCRA, on behalf of the City, shall promptly and in good faith negotiate the terms of an amendment and restatement of the Existing Redevelopment Agreement (the "Second Amended Redevelopment Agreement"). The Second Amended Redevelopment Agreement[1] shall address the matters described below in this Section 4. The said parties shall further cooperate diligently and in good faith to pursue and obtain all necessary Aldermanic and other approvals required in connection with the authorization and execution of the Second Amended Redevelopment Agreement, at the earliest feasible time.

Section 4.3 of the FAA provided that Northside was required to meet certain thresholds and deadlines on its development projects, known as "New Minimum Development Threshold Requirements." The FAA addressed the consequences of failing to meet the new requirements:

5.3 [T]he parties agree that, commencing with the date of the NGA Announcement, [Northside] shall adhere to the New Minimum Development Threshold Requirements and deadlines set forth in Section 4.3 above, and further agree that [Northside's] failure to comply with such New Minimum Development Threshold Requirements and deadlines shall constitute grounds for the City to declare a default under the Existing Redevelopment Agreement or any of the Acquisition Agreements; provided, however, that the parties shall not claim a default under the Existing Redevelopment Agreement or any of the Acquisition Agreements so long as, commencing with the date of the NGA Announcement, Northside adheres to and complies with such New Minimum Development Threshold Requirements and deadlines set forth in Section 4.3 above.

The parties did not reach an agreement on an amendment to the Existing Redevelopment Agreement. In 2018, after the City declared Northside in default of the Existing Redevelopment Agreement, the Bank filed this lawsuit.

In its petition, the Bank asserted claims of fraud and negligent misrepresentation against the LCRA parties based on various representations they allegedly made during the negotiations of the PSA and the FAA. The circuit court granted the LCRA's motion to dismiss the tort claims

---

[1] The FAA refers to the "Second Amended Redevelopment Agreement" because the Existing Redevelopment Agreement was itself an amended version of that agreement.

3

against it on the ground that it was entitled to sovereign immunity,[2] but found that a factual issue remained as to whether LCRA Holdings had the same immunity. Shortly thereafter, LCRA Holdings moved for summary judgment, asserting that, although it is a nonprofit corporation, it was entitled to sovereign immunity as if it were a public entity. The circuit court agreed and entered summary judgment in favor of LCRA Holdings on the Bank's tort claims.

The Bank originally sought to rescind the PSA and the FAA, but it later amended the petition, changing its theory to breach of contract and adding the City as a defendant:

> The City, LCRA and [LCRA Holdings] all breached the PSA and FAA by their [1] declarations of default despite the fact that [Northside] has met the New Minimum Threshold Development Requirements, [2] their failure to support [Northside's] redevelopment of north St. Louis, and [3] their failure to agree to a draft of a Second Amended Redevelopment Agreement consistent with the FAA for presentment to the City's Board of Aldermen.

A few months later, the Bank voluntarily dismissed all claims against the City and did not amend the petition again. Over four years later, the LCRA parties moved for summary judgment on the breach of contract claims, arguing that the undisputed facts showed each of those claims failed as a matter of law because the City, not the LCRA parties, declared the default and because the LCRA parties had no contractual obligation to "support" Northside's redevelopment efforts or to "agree to a draft of a Second Amended Redevelopment Agreement," as the Bank claimed. The circuit court entered summary judgment in favor of the LCRA parties. This appeal follows.

**Standard of Review**

We review a summary judgment de novo. *Estes ex rel. Doe v. Bd. of Trs. of Missouri Pub. Entity Risk Mgmt. Fund*, 623 S.W.3d 678, 686 (Mo. App. W.D. 2021). Summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment

---

[2] The circuit court reasoned that the "LCRA is entitled to sovereign immunity because its involvement in the subject matter of this action constitutes a clearly governmental function," as opposed to a proprietary function for which it would not be immune from tort liability.

as a matter of law. *Id.* One way defending parties, like the LCRA and LCRA Holdings, may establish a right to judgment as a matter of law is by showing undisputed facts that negate any one of the plaintiff's required elements of proof. *See Rhodes Eng'g Co. v. Pub. Water Supply Dist. No. 1 of Holt Cnty.*, 128 S.W.3d 550, 560 (Mo. App. W.D. 2004).

**Discussion**

In its first point, the Bank asserts that the circuit court erred in entering summary judgment in favor of LCRA Holdings on the Bank's tort claims based on sovereign immunity. The Bank's second point challenges the summary judgment in favor of the LCRA parties on the Bank's breach of contract claims. We agree with the Bank that the undisputed facts show LCRA Holdings is not entitled to sovereign immunity and, therefore, the Bank's tort claims against it were not barred as a matter of law. As to the Bank's breach of contract claims, however, we conclude that summary judgment was proper because the undisputed facts negate at least one element of each of those claims.

*Sovereign Immunity on Tort Claims*

In Missouri, "public entities" are entitled to sovereign immunity from tort liability. *See* section 537.600.[3] When an entity is not easily categorized as public or private, it is known as a "hybrid entity," and further scrutiny is required to determine if it is "enough like a public entity" to have sovereign immunity. *Stacy v. Truman Med. Ctr.*, 836 S.W.2d 911, 917 (Mo. banc 1992);[4] *see also State ex rel. Bd. of Trs. of City of N. Kansas City Mem'l Hosp. v. Russell*, 843 S.W.2d 353, 358 (Mo. banc 1992). In *Stacy*, the Supreme Court of Missouri set forth a three-part test for determining whether a hybrid entity should receive sovereign immunity. 836 S.W.2d at 919. First,

---

[3] All statutory references are to RSMo (2016), unless otherwise indicated; all rule references are to the Missouri Supreme Court Rules (2024).

[4] *Stacy* was abrogated on other grounds by *Southers v. City of Farmington*, 263 S.W.3d 603, 614 n.13 (Mo. banc 2008).

5

it "must perform a service traditionally performed by the government." *Id.* Second, the hybrid entity must be "controlled by and directly answerable to one or more public officials, public entities, or the public itself." *Id.* And, third, it must have been formed by the government. *See id.*; *see also Estes*, 623 S.W.3d at 691-92.

The parties agree that the *Stacy* test governs whether LCRA Holdings is entitled to sovereign immunity. And there is no dispute that LCRA Holdings satisfies the first requirement because it performs a service—redeveloping blighted areas—that is traditionally performed by the government. *See Stacy*, 836 S.W.2d at 919. The Bank argues, however, that LCRA Holdings does not satisfy the other requirements.

The second requirement—which the Supreme Court recognized is "probably the most critical"—is dispositive in this case. *Id.* Requiring that the hybrid entity be "controlled by and directly answerable to" the public or a public official or entity "reflects a policy that a hybrid entity should not be afforded sovereign immunity protection unless the hybrid entity is meaningfully controlled by and accountable to the sovereign whose immunity it seeks to appropriate." *Estes*, 623 S.W.3d at 696. The "controlled by" and "directly answerable to" prongs of the second *Stacy* requirement are distinct and have different meanings: "Though a hybrid entity's governing board may be 'controlled by,' (that is, populated by), public officials or public entities, it does not necessarily follow that the hybrid entity is 'directly answerable to' public officials, public entities, or the public." *Id.* at 697. Rather, for the "directly answerable to" prong to have meaning, the hybrid entity must demonstrate that it and its governing board are "meaningfully accountable" to public officials, public entities, or the public. *Id.* at 697-98. Therefore, "[a] hybrid entity's governing body is not 'directly answerable to' anyone unless the actions of the governing body

are subject to reporting obligations or some other mechanism designed to assure and enable meaningful accountability." *Id.* at 699.

In *Stacy*, for instance, the entity did not satisfy the "controlled by and directly answerable to" requirement (1) because a majority of its board members were not appointed or subject to removal by a public official, public entity, or the public itself and (2) because "[n]o governmental body approve[d] the decisions of the board" or required reporting of those decisions before they were made. *Id.* at 697-98;[5] *see also Cas. Reciprocal Exch. v. Missouri Emps. Mut. Ins. Co.*, 956 S.W.2d 249, 254-55 (Mo. banc 1997) (using *Stacy* test for non-sovereign immunity purpose and concluding that the second requirement was satisfied because the governor appointed the majority of the directors on the entity's board and it was required "to make comprehensive reports to the governor and the general assembly annually"). In *Estes*, the hybrid entity satisfied the "controlled by" prong but not the "directly answerable to" prong of the second *Stacy* requirement. 623 S.W.3d at 697, 700. The court found that the entity's board of directors met the "controlled by" prong because it was comprised of public officials and persons appointed by public officials and associated with public entities. *Id.* at 697. But the entity's enabling statute granted its board expansive powers to carry out its functions independently *without* any obligation to report or account for the manner in which it exercised those powers. *Id.* at 698.[6] The court concluded that, like in *Stacy*, the entity in *Estes* was not "directly answerable to" public officials, public entities,

---

[5] The entities in the cases on which *Stacy* relied to formulate its three-part test were entitled to sovereign immunity, in part, because their governing boards were comprised of individuals either elected by the public or appointed by a public official *and* because those boards were required to obtain approval from—or report their actions to—public officials or entities. 836 S.W.2d at 918-19. In one case, the governor selected the governing body, which was required "to report [the entity's] operations and transactions to the governor[.]" *Id.* at 918 (discussing *State ex rel. Trimble v. Ryan*, 745 S.W.2d 672 (Mo. banc 1988)). In another, the public elected the governing body, which was required to report "all proceedings and . . . all receipts and expenditures" to a county commission. *Id.* (discussing *State ex rel. Cass Med. Ctr. v. Mason*, 796 S.W.2d 621 (Mo. banc 1990)).

[6] Contrary to LCRA Holdings's claim, the lack of any "such statutory superpowers" in this case is not dispositive. The crux of *Estes*'s conclusion was not the affirmative grant of authority in the entity's enabling legislation but the absence of any reporting obligations therein. *See Estes*, 623 S.W.3d at 698.

7

or the public because "no governmental body approves, reviews, oversees, evaluates, or regulates the *decisions* of the board . . . and reporting by [the entity], such as it exists, is after the fact." *Id.* at 699 (emphasis added).

For similar reasons, LCRA Holdings satisfies the "controlled by" prong of the second *Stacy* requirement but not the "directly answerable to" prong. It is undisputed that LCRA Holdings is a nonprofit corporation and that the LCRA is its sole member. There is also no dispute that LCRA Holdings is governed by a six-member board of directors, comprised of the five directors on the LCRA's board, each of whom is appointed by the City's mayor, and a sixth director appointed by the president of the St. Louis Municipal Finance Corporation. LCRA Holdings asserted in its statement of uncontroverted material facts that the five directors who also sit on the LCRA's board are "directly answerable to" the mayor and the sixth director is "directly answerable to" the City's comptroller. In support, LCRA Holdings cited to an affidavit in which the city counselor who filed its articles of incorporation attested that the directors are "directly answerable to" those public officials. The Bank denied that LCRA Holdings was answerable to public officials "in connection with the operation of" LCRA Holdings, citing to that same city counselor's deposition (taken shortly after he signed the affidavit) for the proposition that LCRA Holdings is not required to— and did not—seek authorization from the mayor or the City to acquire and remediate the land purchased for the NGA. In response to the Bank's additional statement of uncontroverted material facts supported by that deposition, LCRA Holdings admitted:

- LCRA Holdings "was not required to and did not seek any approval from the City [] to acquire or remediate[] property in connection with the relocation of the NGA facility[.]"
- "[N]o governmental body approves the decisions of" LCRA Holdings's board of directors.
- LCRA Holdings is not required to report its activities to the City or the mayor prior to undertaking them.

8

LCRA Holdings's bare assertion that its board of directors is "answerable to" public officials shows at most that the directors' *tenure* on the board is determined by those officials, but it does not establish that they are accountable to them for the board's *decision-making*. To the contrary, the undisputed facts in this summary judgment record show that the actions of LCRA Holdings's board are *not* subject to any "reporting obligations or some other mechanism designed to assure and enable meaningful accountability." *Id.* Likewise, the undisputed facts patently refute LCRA Holdings's argument that, because the LCRA is the sole member of LCRA Holdings and both are controlled by the same board, LCRA Holdings is accountable to the City in the same manner as the LCRA, which must obtain local government approval for all of its activities.[7]

On this summary judgment record,[8] LCRA Holdings has wholly failed to demonstrate it is meaningfully accountable to a public official, public entity, or the public so as to satisfy the "directly answerable to" prong of the second *Stacy* requirement. *See Stacy*, 836 S.W.3d at 919; *Estes*, 623 S.W.3d at 698. Therefore, we need not address whether it met the third requirement of that test. *See Stacy*, 836 S.W.2d at 921; *Estes*, 623 S.W.3d at 692. Because LCRA Holdings failed to establish a right to judgment as a matter of law on the Bank's tort claims, the circuit court erred in entering summary judgment in its favor. Point I is granted.

---

[7] *See Land Clearance for Redevelopment Auth. of Kansas City, Mo. v. Waris*, 790 S.W.2d 454, 455 (Mo. banc 1990) ("A redevelopment authority . . . requires local governing body approval for all substantive exercise of its statutory powers.") (citing section 99.330(1) RSMo (1986)).

[8] We note that LCRA Holdings filed its motion for summary judgment just 28 days after the circuit court entered an order denying its motion to dismiss. In that order, the circuit court noted that additional facts were needed to demonstrate whether LCRA Holdings met the *Stacy* test, specifically mentioning the "controlled by and answerable to" requirement. The city counselor's affidavit filed in support of the motion for summary judgment does little more than make conclusory assertions tracking the "controlled by and directly answerable to" language from *Stacy*. LCRA Holdings's hasty and limited approach to discovery of the needed facts has proven insufficient to support its motion for summary judgment.

9

*Breach of Contract Claims*

To succeed on a claim for breach of contract, a plaintiff must establish the existence of a valid contract, the parties' rights and obligations under the contract, a breach, and damages. *Rhodes Eng'g*, 128 S.W.3d at 560. The Bank contends on appeal that the circuit court misinterpreted the LCRA parties' obligations under the FAA[9] and, as a result, erred in finding that the Bank's claims for breach of that contract failed as a matter of law. We disagree. The LCRA parties demonstrated a right to summary judgment because the undisputed facts negated one or more elements of each of the breach of contract claims in the Bank's petition. *See id.*

The petition asserted that the LCRA and LCRA Holdings breached the FAA in three distinct ways: "[1] their declarations of default despite the fact that [Northside] had met the New Minimum Development Threshold Requirements, [2] their failure to support [Northside's] redevelopment of north St. Louis, and [3] their failure to agree to a draft of a Second Amended Redevelopment Agreement consistent with the FAA for presentment to the City's Board of Aldermen." We address each in turn.

1. "Declarations of Default"

It is undisputed that the only declaration of default in this case was the City's declaration that Northside was in default of the Existing Redevelopment Agreement. According to the Bank, the LCRA parties agreed to be liable for that breach in Section 5.3 of the FAA:

> [T]he parties agree that, commencing with the date of the NGA Announcement, [Northside] shall adhere to the New Minimum Development Threshold Requirements and deadlines set forth in Section 4.3 above, and further agree that [Northside's] failure to comply with such New Minimum Development Threshold Requirements and deadlines shall constitute grounds for the City to declare a default under the Existing Redevelopment Agreement or any of the Acquisition Agreements; provided, however, that the parties shall not claim a default under the Existing Redevelopment Agreement or any of the Acquisition Agreements so long

---

[9] While the petition asserted claims that the LCRA parties breached both the PSA and the FAA, the Bank has since relied solely on the provisions of the FAA.

10

as, commencing with the date of the NGA Announcement, Northside adheres to and complies with such New Minimum Development Threshold Requirements and deadlines set forth in Section 4.3 above.

The Bank also contends that the LCRA parties' liability for the City's conduct "flows from settled agency principles."

The LCRA parties counter that the Bank's petition did not assert these theories for holding the LCRA parties liable based on the City's breach. The Bank claims that it did so plead and, in any event, that it raised these issues in response to the LCRA parties' motion for summary judgment. But the Bank only sought in its petition to hold the LCRA parties liable for their *own* alleged breaches of the FAA, not the City's. And the Bank did so based on an interpretation of the FAA different from the one it now asserts and without any reliance on the agency theory it posits on appeal.

In the operative petition, the Bank named the LCRA parties *and the City* as defendants, seeking to hold them each liable for their own breaches of the FAA, including Section 5.3. Because the City was not a party to the FAA, the Bank relied on an agency theory to hold the City liable, alleging in the petition that the LCRA parties acted as the City's agents in negotiating and entering into the FAA, binding the City to the obligations in that contract. The Bank did not base its claims against the LCRA parties on any agency theory, as they were named parties to the FAA. According to the petition, one of the obligations under the FAA was that "the City Parties"—which the Bank later explained referred to the City, the LCRA, LCRA Holdings, and "related entities"—agreed "that so long as [Northside] complied with the New Minimum Development Threshold Requirements and deadlines under the FAA, *the City Parties* would not claim a default under the [Existing] Redevelopment Agreement." (emphasis added). This promise, the Bank averred, meant "the City Parties could not claim any default under *any of the negotiated documents* so long as

11

[Northside] met the new thresholds[.]" (emphasis added). Despite Northside's compliance with those thresholds, the Bank alleged, "the City Parties" declared a default "under the [Existing] Redevelopment Agreement (*and other agreements*)." (emphasis added). It would appear that by "other agreements," the Bank was referring to the Acquisition Agreements mentioned in Section 5.3.[10] The Bank asserted that "[t]he City, LCRA and [LCRA Holdings] all breached . . . the FAA *by their declarations of default* despite the fact that [Northside] has met the New Minimum Development Threshold Requirements[.]" (emphasis added).

The Bank voluntarily dismissed its claims against the City but never amended any allegations in the petition. Over four years later, the LCRA parties moved for summary judgment, contending the undisputed facts showed that, while the City had declared a default of the Existing Redevelopment Agreement, the LCRA parties themselves had not declared a default of "any redevelopment agreement," thus negating the Bank's claim that they breached the FAA by "*their* declarations of default." (emphasis added).

In response to the motion for summary judgment, the Bank admitted it was the City that had declared Northside in default of the Existing Redevelopment Agreement and that the LCRA parties had not declared anyone in default of anything. Thus, with no support for the petition's claim that the LCRA parties were liable based on *their* declarations of default (which did not exist), the Bank had to change tack and advance a different theory for holding the LCRA parties liable. First, the Bank altered its interpretation of the obligations in the FAA. Acknowledging that the LCRA parties did not agree that *they* would not declare a default of the listed redevelopment agreements, as alleged in the petition, the Bank contended that in Section 5.3 of the FAA the LCRA

_____

[10] The "Acquisition Agreements" are defined in the FAA as three contracts to which Northside was a party: one with the LCRA, one with the Land Reutilization Authority of the City of St. Louis, and one with the Planned Industrial Expansion Authority of the City of St. Louis.

12

parties "covenanted simply that a default would not be declared and, when they signed the FAA, they bound themselves in the event of a breach of that promise, regardless of the signatory to the default letter." Second, the Bank relied on the agency relationship between the LCRA parties and the City—alleged in the petition for the purpose of binding the City to the terms of the FAA—as a basis for holding the LCRA parties liable for the City's breach of the FAA.

On appeal, the Bank continues its argument that the LCRA parties' liability for the City's breach flows from both the agency relationship and the express language of the FAA, asserting more specifically that Section 5.3 in fact gave only *the City* the power to declare a default of the listed agreements. According to the Bank, that means the LCRA parties agreed they would be liable for breach of the FAA in the specific instance at hand: namely, where the City erroneously declared Northside in default of the Existing Redevelopment Agreement.

In short, the Bank's theory of liability has evolved from (a) seeking to hold the LCRA parties and others directly liable for their own breaches of the universal obligation not to declare a default to (b) seeking to hold only the LCRA parties vicariously liable for the City's breach of its sole obligation not to declare a default.

Contrary to the Bank's suggestion, raising these issues for the first time in opposition to the motion for summary judgment was not sufficient to preserve them for our consideration. When a plaintiff's "theory of recovery is first made in response to a defendant's motion for summary judgment" and is not pled in the petition, that theory "is not preserved for consideration by" an appellate court. *Mathews v. FieldWorks, LLC*, 696 S.W.3d 382, 395-96 (Mo. App. W.D. 2024); *see also Hibbs v. Berger*, 430 S.W.3d 296, 320-21 (Mo. App. E.D. 2014) (declining to consider civil conspiracy theory based on wrongful acts first alleged in response to the defendant's motion for summary judgment and not in the plaintiff's petition). The pleadings play a "crucial" role in

13

the summary judgment process because they "define the issues and form the foundation of the process of adjudication and judgment." *Geran v. Xerox Educ. Servs., Inc.*, 469 S.W.3d 459, 467 (Mo. App. W.D. 2015) (declining to consider the plaintiff's theory for holding the defendant liable under a statute because it was raised for the first time in opposition to the defendant's summary judgment motion and was not included in the plaintiff's petition).

Because the theories on which the Bank relies for reversing summary judgment on this breach of contract claim were not pled in the Bank's petition, we cannot consider them on appeal. *See Mathews*, 696 S.W.3d at 395. The Bank's admission that the LCRA parties did not declare a default of any agreement demonstrated that the Bank's claim, as it was pled in the petition, failed as a matter of law. Thus, the LCRA parties were entitled to summary judgment on this claim.

### 2. "Failure to Support"

We now turn to the second of the Bank's breach of contract theories—that the LCRA parties failed "to support [Northside's] redevelopment of north St. Louis." The LCRA parties sought summary judgment on the ground that the FAA did not impose any such obligation on them. In response, the Bank pointed to the FAA's provision that "[t]he parties will cooperate with each other toward the development of projects in the vicinity of the NGA site."

"The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent," which we do by giving the terms of the contract "their plain, ordinary, and usual meaning." *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. banc 2003) (per curiam). On its face, the provision on which the Bank relies plainly required *only* that the parties cooperate with each other toward the common and specific goal of developing projects near the NGA facility. *See* WEBSTER'S NEW INT'L DICTIONARY 501 (3d ed. 2002) (defining the verb "cooperate" as to "act or work with another or others to a common end,"

14

"operate jointly," "act together," and "produce an effect jointly"). The provision did not impose on the LCRA parties a broader unilateral duty to "support" Northside's redevelopment efforts in that area. As a result, the Bank's claim that any such duty was breached failed as a matter of law, and the LCRA parties were entitled to summary judgment.[11]

### 3. "Failure to Agree"

The Bank's third breach of contract theory was that the LCRA parties failed "to agree to a draft of [an] amended redevelopment agreement consistent with the FAA for presentment to the City's board of aldermen." The LCRA parties moved for summary judgment on the ground that the Bank could not establish that the FAA imposed on them any obligation to *agree* to a draft of an amendment to the Existing Redevelopment Agreement, only to "negotiate" on the City's behalf toward an amendment.

Section 4 of the FAA provides:

> Second Amended Redevelopment Agreement. Northside and LCRA,[12] on behalf of the City, shall promptly and in good faith negotiate the terms of an amendment and restatement of the Existing Redevelopment Agreement (the **"Second Amended Redevelopment Agreement"**). The Second Amended Redevelopment Agreement shall address the matters described below in this Section 4. The said parties shall further cooperate diligently and in good faith to pursue and obtain all necessary Aldermanic and other approvals required in connection with the authorization and execution of the Second Amended Redevelopment Agreement, at the earliest feasible time.

---

[11] The Bank contends the circuit court erroneously relied on deposition testimony (relating to the manner in which the duty to support was allegedly breached), which was attached to the LCRA parties' reply memorandum but not properly put into the summary judgment record via the Rule 74.04(c) paragraph-and-response framework. Nevertheless, we can affirm the circuit court's grant of summary judgment—even if it did so for the wrong reason—based on any ground raised in the motion and supported by facts properly in the summary judgment record. *See Carman v. Wieland*, 406 S.W.3d 70, 79 (Mo. App. E.D. 2013); *City of St. Louis v. Bertels*, 699 S.W.3d 221, 227 (Mo. App. E.D. 2024). Our decision to affirm is not based on deposition testimony that is outside of the summary judgment record or the Bank's failure to prove the breach itself; we affirm because the LCRA parties established they had no obligation to "support" Northside's redevelopment efforts in the first place.

[12] The Bank conceded at oral argument that only the LCRA, not LCRA Holdings, is obligated to do anything under this provision.

15

According to the Bank, numerous subparagraphs of Section 4, which set out the "matters" to be addressed in the amendment, constituted the "baseline" terms that the LCRA parties were required to include in a draft amendment and submit to the City for approval. The Bank argues that the FAA obligated the LCRA parties to not only negotiate, but to "see that negotiation through" to an agreement they were then required to present to the City for approval. This interpretation, the Bank contends, is confirmed by the fact that, elsewhere in the FAA, the parties stated certain provisions "shall be superseded by a Second Amended [] Redevelopment Agreement incorporating the terms contemplated under the [FAA], upon execution of such Second Amended [] Redevelopment Agreement."

But Section 4 merely provided that the parties "shall negotiate" the terms of an amendment, and the plain, ordinary, and usual meaning of "negotiate" does not include actually reaching an agreement on those terms. The act of negotiating is distinct from the act of agreeing; it is commonly understood that negotiating is the process by which parties attempt to reach an agreement and that negotiating does not always successfully result in an agreement. *See* WEBSTER'S NEW INT'L DICTIONARY 1514 (3d ed. 2002) (defining the verb "negotiate" in relevant part as to "communicate or confer with another so as to arrive at the settlement of some matter," "meet with another so as to arrive through discussion at some kind of agreement or compromise about something," and "arrange for or bring about through conference and discussion"). While the goal of negotiation might be to reach an agreement, a promise to negotiate only obligates the party to engage in the process, not to reach the goal. After all, even an unsuccessful negotiation is still a negotiation.

If, as the Bank suggests, the parties had to do no more than repackage the subparagraphs of Section 4 as a "Second Amended Redevelopment Agreement" and present them to the City for

approval, then there would be no reason to include the requirement that they "shall negotiate" those terms. Nor are we persuaded that reaching an agreement on a draft amendment was a foregone conclusion simply because the FAA addressed what the parties would be required to do with such a draft and what would happen if the City approved it. The parties to the FAA may have *contemplated* reaching an agreement on the terms of an amendment to the Existing Redevelopment Agreement, but they only *agreed* to engage in negotiations toward that end. Therefore, the Bank's claim that there was a breach of any such duty to agree failed as a matter of law, and the LCRA was entitled to summary judgment. Point II is denied.

## Conclusion

For the foregoing reasons, the summary judgment in favor of LCRA Holdings on the Bank's claims for negligent misrepresentation and fraud is reversed, and the summary judgment in favor of the LCRA and LCRA Holdings on the Bank's claims for breach of contract is affirmed. The case is remanded for further proceedings consistent with this opinion.

 

 

_____
MICHAEL E. GARDNER, Judge

Thomas C. Clark II, P.J., concurs.
Kenneth R. Garrett III, J., concurs.